Sasetharan ARULAMPALAM,
Petitioner,

v.

John ASHCROFT, Attorney
General, Respondent.

No. 02–71267.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 2003.

Filed Dec. 19, 2003.

Judith L. Wood and Jesse A. Moorman, Los Angeles, CA, for the petitioner.

John S. Hogan and Cindy S. Ferrier, Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

Before PREGERSON, FERNANDEZ, and BERZON, Circuit Judges.

BERZON, Circuit Judge.

Sasetharan Arulampalam, a native and citizen of Sri Lanka, petitions for review of the Board of Immigration Appeals' ("BIA") affirmance of an Immigration Judge's ("IJ") denial of his applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We have jurisdiction under 8 U.S.C. § 1252. As the BIA adopted the IJ's reasoning, we review the latter, *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1050 (9th Cir.2002), grant the petition for review, and remand.

## BACKGROUND

Arulampalam was born on November 20, 1978 in northern Sri Lanka, where he lived for two decades with his family. He is a Hindu of Tamil ethnicity. Arulampalam attended school intermittently from ages 5 to 15. He cannot read or write well and worked as a farmer alongside his father.

The Liberation Tigers of Tamil Eelam ("LTTE" or "Tigers") is, according to the State Department's 2001 Country Report, "an insurgent organization fighting for a separate ethnic Tamil state in the north

and east of [Sri Lanka]."[1] Tamils are an ethnic minority in Sri Lanka, constituting 18% of the population as of 2001. Both the LTTE and the Sri Lankan government were reported by the State Department to engage regularly in acts of persecution.

Arulampalam's testimony and asylum documents establish the following: In May 1999, when in the city of Mannar to buy supplies for his family's farm, Arulampalam was arrested by the Sri Lankan army and taken to a camp. He was detained for a week, until the supply merchant came and spoke to the army commander, securing Arulampalam's release.

On September 20, 2000, Arulampalam was playing ball with eight other young men. Three members of the LTTE drove up and used physical compulsion combined with a death threat to force Arulampalam and two others to dig bunkers and fill sandbags for two days. This abduction was repeated on September 28, 2000, when LTTE members came to Arulampalam's family farm. While digging bunkers this second time, Arulampalam had to take cover on several occasions to avoid army bombardment.

While Arulampalam was working for them, the Tigers repeatedly asked him to join the organization. Arulampalam refused because he felt a responsibility to his family; feared that membership would be dangerous; and was averse to fighting and killing, which his religion forbids. After the second abduction, during which the LTTE indicated that he would be expected to work again, Arulampalam decided that he had to leave the area immediately. His family arranged to have him taken in a van to Colombo, the country's capital in the south, which is not LTTE-controlled territory. Although a pass was required to make the trip, the person transporting Arulampalam apparently avoided check-points.

Once Arulampalam arrived in Colombo, he stayed with relatives. An older man living in the relatives' house took Arulampalam's identification card to the police station and registered him. On October 8, about a week after Arulampalam's arrival, police came to the house and arrested him, marking the start of a 22–day detention with five days of torture.

Arulampalam's identification was taken and he was blind-folded. While in custody, he was beaten with a pipe; his head was slammed against a wall; his throat was tied; and the police put gasoline in a shopping bag before placing the bag over Arulampalam's head to make him breathe the fumes. Arulampalam was also forced three times to assume a position whereby his arms were wrapped around his knees and his wrists tied together, following which a stick was inserted behind his knees so that he could be hung from two hooks in the ceiling and beaten on the soles of his feet with a plastic pipe. Arulampalam demonstrated this physical position to the IJ, explained how the restraints worked, and stated that he was "almost kind of unconscious" after being untied.

The police repeatedly questioned why Arulampalam came to Colombo and accused him of planning to plant a bomb. In Arulampalam's opinion, he was suspected because he is Tamil and had recently arrived in Colombo. The police interrogators asked if Arulampalam belonged to the LTTE. He always replied in the negative. They responded: "So how do we believe you guys, we always, everybody's saying this same thing, and after that, you throw bombs to us." Arulampalam did not tell the police about the occasions when the

---

1. *But see* Amy Waldman, *In New Proposal, Rebels Seek Territorial Autonomy in Sri Lanka,* N.Y. TIMES, Nov. 2, 2003 (referring to a continuing February 2002 cease-fire).

Tigers forced him to dig bunkers and fill sandbags because he believed that disclosure would endanger his life.

When Arulampalam was released on October 30, 2000, he was told that he had to sign a paper written in Sinhala,[2] but he does not read Sinhala. A translation and copy of the original paper indicate that Arulampalam was released by a magistrate after a police sub-inspector "informed the court that there was insufficient evidence against the accused to prosecute." The police cautioned Arulampalam that they still thought he was an LTTE member and that he was subject to re-arrest at any time. Thereafter, Arulampalam was required to report at the police station on a weekly basis.

Arulampalam complied with this requirement without incident each week until May 21, 2001. On that day he was alerted that those who had gone to the police station for their sign-in were arrested. The IJ termed this information "some gossip from friends." Asked why he thought the police were arresting people, Arulampalam replied: "Because they're suspect, and suddenly, they may arrest people, and sometimes, they kill people." Counsel pointed to record evidence of LTTE bombings in April 2001 and suggested that the government was rounding up Tamils in response.

On May 24, the day before he was due to report again, Arulampalam left Sri Lanka. His family paid an agent to get him to the United States. Arulampalam arrived at Honolulu airport on July 25 without proper travel documents. In an airport interview, he expressed fear of persecution if returned to Sri Lanka, stating that "I had a lot of trouble with the army and the government. They were beating us[;] that is why I wanted to escape." Nine days

later an asylum officer determined that Arulampalam had established a credible fear of persecution.

At petitioner's removal hearing in Seattle on November 27, 2001, IJ Kendall Warren expressed frequent frustration at Arulampalam's testimony, including tangential matters such as his use of Tamil words to describe various people and family relationships, as well as the complexity of place names in Sri Lanka: "more long words that are going to have to be spelled out."

Although as a matter of course we do not excerpt removal hearings at length, it is appropriate in this case to do so, given the nature of the determinative credibility issue. Our reproduction of the following passages demonstrates the tenor of the exchanges between Arulampalam and the IJ, which compounded the fact that "most witnesses," particularly uneducated, non-English speakers seeking asylum, "are uncomfortable and nervous when being cross-examined and, perhaps, when being questioned by a judge." *Singh–Kaur v. INS*, 183 F.3d 1147, 1151 (9th Cir.1999).

First, the IJ repeatedly expressed irritation about Arulampalam's use of the Tamil word "annai" to describe older men. The judge instructed Arulampalam: "Let's not talk about annais anymore because that doesn't tell us anything."

Similarly, after Arulampalam explained that the equivalent word for a female was "akkaa," the IJ responded:

> You said that about 15 times. What I want to know is, you referred to her [a woman who visited Arulampalam in the Colombo detention facility] as your akkaa, and I'm wondering what relation she is to you.

---

2. A State Department background note on Sri Lanka in the record indicates that the majority ethnic group (74% of the population) is Sinhalese and their language is Sinhala.

A: My father's brother's daughter.

IJ: That would be your cousin, wouldn't it?

A: We call her cousin.

IJ: Well, akkaa applies to every woman in Sri Lanka that's older than you, right?

A: Yes.

IJ: That doesn't tell us very much. It narrows it down to a few million women. So it's more accurate to say—if it's your father's brother's daughter, it would be your cousin, wouldn't it?

A: We call petiappa (phonetic sp.) daughter.

IJ to translator: What?

Translator: We call petiappa daughter.

IJ: Petiappa?

Translator: Petiappa. In Tamil, we call petiappa.

IJ: What does that mean? Doesn't petiappa have an interpretation?

Translator: It means my father, father—my father's brother, I call petiappa.

IJ: Your father's brother, would that mean—does petiappa mean uncle then?

Translator: No, in our language, we say petiappa.

IJ: Doesn't it have a mean equivalent to something in English? Normally, your father's brother is your uncle.

Translator: In English, we call uncle, but in our language, we call petiappa.

In addition, the degree of detail in Arulampalam's testimony was a recurring point of contention. The IJ sometimes thought Arulampalam's narrative was too specific, while at other junctures petitioner's answers were deemed insufficiently precise.

As an example of the former, when describing his second abduction by the LTTE, Arulampalam began:

A: It was second time, on 28th, I was at the farm, then I have my shovel I take to the home, then I went from home.

IJ: So the second time, you were at your farm, and they came by to pick you up at the farm.

A: Yes.

IJ: Well, what about the shovel?

A: Yes, that's what I use—I used my, my farm—the shovel.

IJ: What does the shovel have to do with your story? Why are you telling us about your shovel?

A: That's the one I take at my house. [ . . . ]

IJ: Did you take your shovel with you to work on the bunker?

A: No.

IJ: I don't understand why you even mentioned the shovel, sir. Why—what has the shovel got to do with your story?

A: Because I take that shovel from my farm to my house. I left the shovel at my house.

IJ: So when they picked you up at the farm, you said you had to stop by your house and drop off the shovel, is that it?

A: Yes, that's the one I'm talking about.

IJ: Okay. [ . . . ]

Later, the IJ focused on Arulampalam's journey to Colombo:

Counsel: Now, do you need a pass to go from Vanai to Colombo?

A: Yes. We had to get the pass, but the annai get—he took me without taking a pass.

Counsel: So did you travel without a pass?

A: So I went to Vavuniya first.

Counsel: With your—

IJ: [interrupts to ascertain spelling of Vavuniya and goes off the record]

IJ: We are back on the record. During the break between direct and cross, I'm going to go look in the *World Atlas* and see if there's another spelling for Vavuniya.

IJ to counsel: Go ahead. You asked him if he traveled without a pass.

Counsel: Right, and he said—

IJ: And typically, he wasn't responsive.

Counsel:—he went to Vavuniya first.

IJ: He said he went to Vavuniya.

Counsel: And what happened in Vavuniya?

A: Nothing happen, but he make the pass or get the pass somewhere, but I don't know how he get the pass.

Counsel: So did you travel from Vanai to Vavuniya without a pass?

A: Yes. I had to get the pass from Tigers to go to Vavuniya, but I didn't obtain pass from the LTTE from there.

Counsel: So you went from Vanai to Vavuniya without a pass?

A: Yes.

Counsel: Okay.

IJ: You had a pass from the Tigers, but not from the army?

Counsel: No, he said he had to get a pass, but he didn't get it. He was supposed to get a pass. Apparently, that's a controlled area.

INS Counsel: Your Honor, he said he had to get a pass from the Tigers, not from the government.

Counsel: But he didn't get it, he said.

IJ: Well I don't know if he did or not. I'm going to play it back. As I said, this is really confusing testimony.

[Off the Record.]

IJ for the record: All right. I played it back, and apparently—well, what he did say was that he was supposed to get a pass from the Tigers to go to Vavuniya, but he did not get a pass from the LTTE, which would mean the same thing, so he did travel without a pass from Vanai to Vavuniya.

At other times, the IJ excoriated Arulampalam for failing to answer questions when in fact petitioner was endeavoring to do just that (and conveying clear information that the IJ missed while distracted by his exasperation). For example:

Counsel: What does it mean in your mind to join the Tigers?

A: I have two older sister and one younger sister. I have one younger brother. My father is old, so I am the responsible person for my family.

Counsel: What is—

IJ: Sir, you're not answering the question.

IJ to translator: Did you interpret the question ... what does it mean to join the Tigers?

Translator: Yes, I did, Your Honor.

IJ: All right. Sir, I will repeat the question. What does that mean when you join the Tigers?

A: It's too dangerous for my life.

IJ: What does it mean to join the Tigers?

A: I have brothers and sisters. I had to look after them.

[Off the record.]

IJ for the record: All right. We will try the question again. Maybe the respondent didn't understand. We were asking for a definition of the word join.

This colloquy is a representative vignette of the proceedings: It was not until the end of the exchange that it became clear that what the IJ expected was an answer addressing the significance of the word "join," as opposed to a description of the consequences Arulampalam perceived

LTTE membership to entail, yet the IJ accused petitioner of being unresponsive when he understood the question differently from what the IJ intended.

■ After making an adverse credibility finding, discussed below, the IJ noted that even if Arulampalam's story were credible, there was no reason to think that Arulampalam would be in danger if returned to Sri Lanka. No one else in his family has allegedly been persecuted.[3] The IJ recognized that there has been severe abuse of Tamils in Sri Lanka because of the conflict between the LTTE and the government. The IJ also stated in his decision that "the type of treatment described by [Arulampalam], if it were truthful, would appear to be sufficiently severe to suggest that he was being punished for imputed political opinion, that is, membership in the LTTE, or it could be because the police thought he was a terrorist." With regard to Arulampalam's jailing, the IJ added that "it would appear that there was a bona fide detention and interrogation for law enforcement purposes. The only element which takes it out of that was the degree of torture which the respondent allegedly suffered."[4]

---

**3.** *But see Rios v. Ashcroft,* 287 F.3d 895, 902 (9th Cir.2002) ("[A] petitioner's family's continued safety does not rebut the petitioner's well-founded fear of future persecution when there is no evidence that the family is similarly situated or subject to similar risk, and nothing in the record supports an inference that their safety ensures that[petitioner] will be safe.") (quotation marks and citation omitted).

**4.** For proceedings after remand, we note that "[t]orture in the absence of any legitimate criminal prosecution, conducted at least in part on account of political opinion, provides a proper basis for asylum and withholding of deportation even if the torture served intelligence gathering purposes." *Ratnam v. INS,* 154 F.3d 990, 996 (9th Cir.1998); *see also Navas v. INS,* 217 F.3d 646, 660 (9th Cir. 2000) ("[I]f there is no evidence of a legiti-

## DISCUSSION

### I. *Demeanor*

■ Despite finding "no major inconsistencies in [Arulampalam's] testimony," the IJ made an adverse credibility finding based, inter alia, on "aspects of [his ] demeanor and method of answering questions." While "we accord substantial deference to an IJ's credibility finding[, ] . . . [w]hen the IJ provides specific reasons for the questioning of a witness's credibility, this court may evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible." *Mendoza Manimbao v. Ashcroft,* 329 F.3d 655, 658 (9th Cir.2003) (quotation marks and citation omitted).

■ We conduct this evaluation mindful that the court is to "give special deference to a credibility determination that is based on demeanor." *Singh–Kaur,* 183 F.3d at 1151 (deferring to the IJ's "ability to differentiate between the usual level of anxiety and Petitioner's behavior, for example, 'literally jumping around in his seat'" as

mate prosecutorial purpose for a government's harassment of a person . . . there arises a presumption that the motive for harassment is political.") (quotation marks and citation omitted).

As stated in *In re S–P–,* 21 I. & N. Dec. 486, 493 (BIA 1996): "In applying asylum law in the context of the Sri Lankan conflict, it is not an easy task to evaluate an asylum applicant's claim that harm was inflicted because of imputed political views rather than a desire to obtain intelligence information. There may have been, in fact, a combination of these motives. . . . The difficulty of determining motive in situations of general civil unrest should not, however, diminish the protections of asylum for persons who have been punished because of their actual or imputed political views, as opposed to their criminal or violent conduct."

one of four factors supporting an adverse credibility finding) (quotation marks and citation omitted).[5] Here, however, we are not dealing with "inferences based solely on demeanor, often described as testimonial inferences," as the IJ did not point to "non-verbal communication" as a basis for his decision. *Paredes–Urrestarazu*, 36 F.3d at 818 Rather, the IJ's credibility determination rested on factors concerning the nature of petitioner's testimony, all of which are ascertainable from the record and unsupported by it.

■ Without referring to specific portions of the transcript, the IJ cited Arulampalam's "fragments of thoughts" as being "more consistent with someone who has memorized a story and then was repeating it but was leaving out certain portions." It is improper for the IJ to have made "[g]eneralized statements that do not identify specific examples of evasiveness or contradiction in the petitioner's testimony." *Garrovillas v. INS*, 156 F.3d 1010, 1013 (9th Cir.1998). The IJ's mere assurance that "a review of the record will show that [Arulampalam's] answers were frequently fragmentary . . . and did not make much sense as a response to a question" hampers our ability to "conduct[ ] a proper review." *Id.*[6]

Nonetheless, after perusing petitioner's testimony, we conclude that, even were we to accord "special deference" to the IJ, "the record creates such a doubt as to[the so-called demeanor finding's] validity that accepting it would be unreasonable." *Paredes–Urrestarazu*, 36 F.3d at 819. First, the IJ's credibility findings do not specifically and cogently refer to any aspect of Arulampalam's demeanor, a term which we have described as "including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication." *Id.* at 818 (quoting with approval the opinion of Wallace, J., in *Penasquitos Vill., Inc. v. NLRB*, 565 F.2d 1074, 1078–79 (9th Cir. 1977)).

Second, the IJ's impugning of the manner in which Arulampalam's testimony was delivered cannot displace the substantial evidence of its detailed and consistent content describing serious abuse. *See In re B–*, 21 I. & N. Dec. at 70 ("[W]hen we view the demeanor problem within the context of the whole record before us, we are impressed with the indications of the applicant's truthfulness. The applicant's testimony was consistent throughout."). *Compare In re A–S–*, 21 I. & N. Dec. 1106, 1112 (BIA 1998) ("The instant case is not one in which the alien delivered halting and hesitant testimony which was nonethe-

---

5. *Compare In re B–*, 21 I. & N. Dec. 66, 70 (BIA 1995) (the asylum applicant's "tendency during his testimony to look down at the table or at the wall behind the interpreter instead of at the Immigration Judge" did not necessarily indicate deception). We have also stressed that "labeling a finding one based on demeanor should not lead factfinders to believe that to make their findings almost totally unassailable they need only use the right incantation." *Paredes–Urrestarazu v. INS*, 36 F.3d 801, 818 (9th Cir.1994) (quotation marks and citation omitted).

6. We note that the transcription of these translated proceedings is often oddly truncated, with missing articles and verbs, making it appear that Arulampalam was speaking broken English, when in fact he was speaking his native tongue. Also, when the translator spoke directly to the IJ, his speech was transcribed similarly. On remand, some inquiry into the conformity of the transcript with Arulampalam's actual testimony may be in order. Notably, the transcription service rendered the interpreter's translation far less fluently here than did a different transcription service in another Sri Lankan Tamil asylum case we heard involving the same interpreter and IJ.

less detailed and consistent in its factual content. Rather, the respondent's testimony is marked by inconsistencies and omissions, and the Immigration Judge's findings regarding the substance of the respondent's testimony provide additional support for the reasonable conclusion that the respondent's testimonial demeanor called his credibility into doubt.").

We observe that the IJ's appraisal of petitioner's "manner of speech, which was not spontaneous with linear thinking and goal-directed, logical responses to questions," combined with the judge's repeated interruption and browbeating of Arulampalam during his testimony, illustrated by the passages quoted above, bespeaks an insensitivity to petitioner's cultural and educational background. *Cf. Garrovillas*, 156 F.3d at 1014 ("Our review of the record does reveal that the IJ frequently expressed frustration at Garrovillas's responses, but these instances are better explained by language barriers, interpreter problems, and pervasive antagonism on the part of the IJ than by any evasiveness on the part of Garrovillas."); *see generally* Ilene Durst, *Lost in Translation: Why Due Process Demands Deference to the Refugee's Narrative*. 53 RUTGERS L. REV. 127, 128 (2000) (arguing that "[m]any negative determinations of credibility can be explained by the inability of the asylum applicant, or his attorney, to translate the persecution suffered into a narrative graspable by the adjudicator, and/or the adjudicator's inability to transcend the barriers created by the inherent otherness of trauma, culture, and language."). Various statements by the IJ appear to presume a benchmark of "normalcy" for refugee testimony that is incompatible with the pluralism inherent in global diversity and at odds with principled adjudication of asylum claims. Similarly, the IJ regarded as extraneous details that constitute an important part of the story to a young, semi-

literate farmer from rural Sri Lanka, such as where his shovel was left, while frequently upbraiding Arulampalam for not knowing details of matters, such as checkpoint avoidance by his escort to Colombo and registration in the city, that were most likely entirely beyond his life experience.

## II. *Other Credibility Factors*

In addition to his general and vague reliance on the form of Arulampalam's testimony, the IJ commented on Arulampalam's ignorance of what the initials LTTE stand for (despite his calling them "Tigers" and knowing the name of the sought Tamil homeland, "Eelam"); the improbability of his bypassing checkpoints on the way to Colombo; and his lack of knowledge of the registration procedure once in the city. These criticisms of Arulampalam's testimony are grounded only in speculation by the IJ and cannot rebut petitioner's credibility, for they are unsupported by the record.

To wit, the IJ's "belie[f] that experienced soldiers would be able to guard against such easy evasion of [roadblocks]" is pure hypothesis, as are his estimation of what type of registration would be "acceptable to the police" and his observation that: "The Court feels that if [Arulampalam] had actually gone to Colombo and been registered, he would have understood what it meant, and he probably would have registered himself rather than some third party registering him, which would seem to defeat the purpose of registration and probably not be acceptable to the police." *See Salaam v. INS*, 229 F.3d 1234, 1238 (9th Cir.2000) (per curiam) ("This Court reverses an adverse credibility determination that is based on speculation and conjecture and is not supported by evidence in the record.") (quotation marks and citations omitted); *Lopez–Reyes v. INS*, 79 F.3d 908, 912 (9th Cir.1996) (IJ's "astonishment" regarding aspects of petitioner's

testimony was "conjecture" that could not "substitute for substantial evidence"). Those who escape from ethnic conflict are not always privy to details of how their families hold hostile authorities at bay or smuggle them out of danger. Absent information being distributed on a "need to know" basis, there would be many fewer survivors of repressive regimes.

Nor does Arulampalam's omission at the airport of specific details about his torture that were later revealed in his testimony support the adverse credibility finding. The airport interview was fully consistent with Arulampalam's later testimony; the only difference was the level of detail. *See Singh v. INS,* 292 F.3d 1017, 1021 (9th Cir.2002) ("Requiring evidentiary detail from an airport interview not only ignores the reality of the interview process, but would, in effect, create an unprecedented preasylum application process."); *see also Bandari v. INS,* 227 F.3d 1160, 1167 (9th Cir.2000) ("[T]he mere omission of details [in an asylum application] is insufficient to uphold an adverse credibility finding.") (citations omitted). From the moment of his arrival at the Honolulu airport, Arulampalam mentioned "beating" and stated that he was detained by the police from "October 8 2000 … until October 238 [*sic*] 2000. They did hit me while I was in their custody." Notes from the credible fear interview state that "[a]pplicant was physically harmed during last arrest." In his asylum application, Arulampalam described in some detail the forms of torture that he experienced at the police station. In this context, the IJ's concern about a lack of "great detail about such horrific torture" in the airport statement and the asylum officer's notes is not merited.

The government argues that Arulampalam "could have easily" corroborated "his dubious testimony regarding the alleged severe torture he suffered," adding that "Arulampalam presented no documentation from any of the people who resided in [his cousin's Colombo] house that he was in fact tortured." We disagree with the related contention that this case is like *Sidhu v. INS,* 220 F.3d 1085, 1092 (9th Cir.2000), which held that "where the IJ has reason to question the applicant's credibility, and the applicant fails to produce non-duplicative, material, easily available corroborating evidence and provides no credible explanation for such failure, an adverse credibility finding will withstand appellate review." Here, as we have developed, the IJ had no good reason to question Arulampalam's credibility.

Moreover, the government distorts our holding in *Sidhu* by omitting two crucial elements. First, Arulampalam was not "given an opportunity at his IJ hearing to explain his failure to produce material corroborating evidence." *Id.* at 1091. Second, "it is inappropriate to base an adverse credibility determination on an applicant's inability to obtain corroborating affidavits from relatives or acquaintances living outside of the United States—such corroboration is almost never easily available." *Id.* at 1091–92; *see also Ladha v. INS,* 215 F.3d 889, 901 (9th Cir.2000) ("[A]n alien's testimony, if unrefuted and credible, direct and specific, is sufficient to establish the facts testified without the need for any corroboration.").

In sum, a reasonable adjudicator would be compelled to conclude that the IJ's adverse credibility determination is not supported by substantial evidence. *See He v. Ashcroft,* 328 F.3d 593, 595 (9th Cir.2003).

## CONCLUSION

Not long into Arulampalam's testimony, the IJ admitted: "I'm totally lost. This is getting to be the most confusing testimony I've ever heard in one of these

cases. I don't know whether it's the respondent's talk or what, but I never had this much trouble understanding testimony." Given our starkly different appraisal of the record, "the parties would be far better served by the assignment to [these] proceedings of a different IJ," if necessary. *Garrovillas,* 156 F.3d at 1016 n. 4; *see also Paramasamy,* 295 F.3d at 1055 n. 4. As the IJ denied Arulampalam's applications based on an adverse credibility finding, rather than reaching the merits, we remand this matter for further proceedings, accepting Arulampalam's testimony as credible, to determine his eligibility for asylum, withholding of removal, and relief under the CAT. *See He,* 328 F.3d at 603–04.

**PETITION GRANTED AND REMANDED.**

FERNANDEZ, Circuit Judge,
Concurring and Dissenting:

I concur in the majority's decision to grant the petition under the Torture Convention,[1] but otherwise dissent.

The BIA's determination that an alien is not eligible for asylum must be upheld if " 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) (citation omitted). "It can be reversed only if the evidence presented . . . was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* When an alien seeks to overturn the BIA's adverse determination "he must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Id.* at 483–84, 112 S.Ct. at 817; *see also Ghaly v. INS,* 58 F.3d 1425, 1429 (9th Cir.1995). Credibility determinations are judged by the same basic standard. *See Gui v. INS,* 280 F.3d 1217, 1225 (9th Cir. 2002); *Cordon–Garcia v. INS,* 204 F.3d 985, 990 (9th Cir.2000); *de Leon–Barrios v. INS,* 116 F.3d 391, 393 (9th Cir.1997). In that area, however, we have added that the determination " 'must be supported by a specific, cogent reason.' " *de Leon–Barrios,* 116 F.3d at 393 (citation omitted); *see also Gui,* 280 F.3d at 1225; *Akinmade v. INS,* 196 F.3d 951, 954 (9th Cir.1999).

Here Arulampalam's claim failed because the BIA, in reliance on the IJ's decision, determined that Arulampalam was not credible. I am unable to say that the determination was not supported by substantial evidence in the record. Moreover, that lack of credibility went to the heart of Arulampalam's asylum claim. *See de Leon–Barrios,* 116 F.3d at 394. Essentially, his manner of testifying, especially his fragmentary way of answering questions and his apparent lack of knowledge of many of the most significant details surrounding his alleged persecution, left his story with a lack of verisimilitude. The IJ could decide that it was made up rather than credible.[2] On this record, I cannot

---

1. United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. GAOR, 39th Sess., Supp. No. 51, U.N. Doc. A/RES/39/46·(1984).

2. Arulampalam asks that we consider IJ harassment as a reason for his impoverished testimony. However, he did not raise that claim before the BIA, so, in my opinion, we cannot consider it. *See Rashtabadi v. INS,* 23

F.3d 1562, 1567 (9th Cir.1994). He also wants us to make excuses for him which are not supported by evidence in the record. For example, his manner of testifying is because he is uneducated and ignorant; or maybe he was upset; or maybe there were language and cultural difficulties that made him different from other aliens—even those from Sri Lanka; or maybe his family never told him anything about its arrangements for travel, including the rapid (2–day) decision to send

say that "no reasonable factfinder could fail to find" him credible. *Elias–Zacarias,* 502 U.S. at 484, 112 S.Ct. at 817. Thus, the BIA could properly determine that he was not entitled to asylum.[3]

However, I agree that the BIA erred when it determined that Arulampalam was not entitled to relief under the Torture Convention. The standard under that Convention is not identical with the standard for asylum, and a person's lack of credibility might result in denial of relief under the latter without absolutely foreclosing relief under the former. *See Kamalthas v. INS,* 251 F.3d 1279, 1282–84 (9th Cir.2001). The IJ erred when he wholly failed to apply the different standard. I, however, do not join the suggestion that the case be assigned to a different IJ.

Thus, I concur in part and dissent in part.

him on his odyssey. However, as I see it, that is not within our purview.

**3.** Because Arulampalam did not meet the requirements for eligibility for asylum, he was not entitled to withholding of removal either. *See Ghaly,* 58 F.3d at 1429.