**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROSALINA LOPEZ-UMANZOR,
                    *Petitioner,*

          v.

ALBERTO R. GONZALES,* Attorney
General,

                    *Respondent.*

No. 03-72014

Agency No.
A75-011-140

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
January 13, 2005—Seattle, Washington

Filed May 6, 2005

Before: Mary M. Schroeder, Chief Judge, and
Alfred T. Goodwin and Susan P. Graber, Circuit Judges.

Opinion by Judge Graber

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**COUNSEL**

Mara Kimmel, Catholic Social Services, for the petitioner.

James E. Grimes and Thomas K. Ragland, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

David R. Fine, Kirkpatrick & Lockhart LLP, Harrisburg, Pennsylvania, and Gail L. Pendleton, Associate Director, National Immigration Project of the National Lawyers Guild, Boston, Massachusetts, for the amici curiae.

**OPINION**

GRABER, Circuit Judge:

Petitioner Rosalina Lopez-Umanzor petitions for review of a decision of the Board of Immigration Appeals ("BIA") finding her ineligible for cancellation of removal and denying her request for voluntary departure. An immigration judge ("IJ") had found Petitioner to be ineligible for relief because there was "reason to believe" that she had been involved in drug trafficking, 8 U.S.C. § 1182(a)(2)(C); the IJ disbelieved her testimony to the contrary. On appeal of the IJ's decision, the BIA rejected Petitioner's due process arguments and affirmed the IJ's adverse credibility determination. We grant the petition for review and remand for a new hearing because the IJ

refused to allow Petitioner to present relevant expert testimony that bore on Petitioner's credibility, relying instead on his own stereotypical assumptions about domestic violence.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner is a native and citizen of Honduras who entered the United States without inspection in 1989. Nine years later the government sought her removal. Petitioner conceded removability, but applied for cancellation of removal under 8 U.S.C. § 1229b(b)(2), a provision available to certain victims of domestic violence.[1] The IJ denied her application because he found a "reason to believe" that Petitioner had been involved in drug trafficking and, consequently, that she lacked good moral character; he also concluded that her testimony regarding domestic violence was not credible. The BIA affirmed the IJ's adverse credibility finding and his conclusion that Petitioner was ineligible for cancellation of removal and voluntary departure.

## A. *The course of proceedings before the IJ*

In advance of her removal hearing, Petitioner submitted evidence intended to corroborate her allegation that she had suffered domestic violence, including medical records from an emergency room visit and written statements from social service providers and a psychologist who had worked with Petitioner. The government submitted a criminal information, charging Petitioner with Misconduct Involving a Controlled Substance, and a notice that the charge had been dismissed. Petitioner was the sole witness at the removal hearing on April 1, 1999. The government presented no further evidence and no evidence to undermine Petitioner's testimony regarding the abuse that she had endured.

---

[1]Petitioner was not eligible under the general cancellation of removal provision, 8 U.S.C. § 1229b(b)(1), because she had not been present in the United States for ten years.

After the April 1 removal hearing (and after missing the deadline to file a post-hearing brief), the government submitted a written statement from a detective regarding the circumstances surrounding the dismissed criminal charge. The government initially sought, and was granted, a second hearing to present the detective's live testimony. Later, however, the government twice tried to withdraw its request for a second hearing. The IJ denied the withdrawal motions and subpoenaed the detective. After Petitioner's interlocutory appeal to the BIA was denied, the second hearing went forward, with the IJ conducting the direct examination of the detective. Petitioner did not testify at the second hearing, but made an offer of proof and presented one character witness.

B.   *Testimony regarding domestic violence*

Petitioner's husband, Luis Calzadillas, is a lawful permanent resident of the United States. Petitioner testified that, on the night she first met Calzadillas, he drugged and raped her, causing her to become pregnant. He assaulted her during that pregnancy and her two others with him, including hitting her and kicking her in the stomach. On one occasion, he caused a miscarriage. Even when Petitioner was not pregnant, Calzadillas regularly hit and beat her, threw her to the ground, and kicked her. He repeatedly threatened to call immigration authorities if she revealed the ongoing abuse.

When Petitioner tried to leave Calzadillas, he twice followed her from Texas, where they had been living, to California, and then he followed her to Alaska. Calzadillas arrived at Petitioner's apartment in Anchorage. He began drinking and attacked Petitioner with a knife, attempting to stab her in the back, but instead hitting her hand as she turned around. She went to an emergency room for treatment, where she told the doctors that she had cut her hand on a broken bottle. Petitioner testified that she lied about the cause of the injury because Calzadillas had threatened to do something worse if she did not report it that way.

After receiving treatment at the emergency room, Petitioner returned to her apartment. She returned there because, she testified, she thought (incorrectly, as it turns out) that Calzadillas had left, and she had nowhere else to go at the time. Later, however, Petitioner and her two youngest daughters sought refuge at a domestic violence shelter in Anchorage, which provided services to her as "a survivor of domestic violence" at the hands of Calzadillas.

The IJ expressed doubt about whether Petitioner was telling the truth about the abuse (a subject that we will discuss in detail below). Nonetheless, when Petitioner offered the live testimony of several expert witnesses who could testify on the topic of domestic violence, and perhaps shed light on the IJ's credibility concerns, the IJ refused to allow them to testify.

## C. *Testimony regarding drug trafficking*

While residing in Alaska, Petitioner was arrested and charged with Misconduct Involving a Controlled Substance in the third degree. At the time of the arrest, Petitioner was a passenger in a car belonging to Jose Armando Gomez-Mendoza who, she testified, was the boyfriend of her 23-year-old daughter. Anchorage police stopped the car and arrested both Gomez-Mendoza and Petitioner. The district attorney later dropped the charge against Petitioner.

At the second hearing in this case, Anchorage Detective Bruce Edward Bryant testified that a reliable informant had identified Petitioner as one of several people involved in the distribution of crack cocaine. Detective Bryant had no first-hand knowledge of Petitioner's reported involvement in drug transactions, however, nor did any of the other officers on the case witness a transaction between the informant and Petitioner. On the day of the arrest, according to the informant, Gomez-Mendoza obtained a small package of cocaine from Petitioner, who was holding it in her mouth, and sold the package to the informant. When the car was stopped, half the

marked "buy" money was found in Gomez-Mendoza's pocket and half in Petitioner's purse. Documents in her purse showed her address to be the same as the one listed on the car's registration, and telephone records showed several calls from Gomez-Mendoza to Petitioner's number (which also was her daughter's number). Additionally, a storage locker rented in Petitioner's name contained $934, three pagers, five cellular telephones, and identity documents bearing Petitioner's photograph but using other names.

On the other hand, no cocaine was found on Petitioner when she was arrested. Nor, despite a search, were any drugs found in her apartment. At the initial hearing, Petitioner testified unequivocally that she never was involved in drug trafficking. She testified that she was in the car because she had asked Gomez-Mendoza for a ride to a shopping center. Specifically, Petitioner denied having held a package for Gomez-Mendoza, denied having put anything in her mouth, and denied having taken anything out of her mouth to give to anyone.

Following Detective Bryant's testimony, the IJ accepted Petitioner's offer of proof with respect to the facts to which she had testified at the earlier hearing: she relied on Gomez-Mendoza for transportation; she had no involvement in Gomez Mendoza's drug transactions; and Gomez-Mendoza gave her half of the "buy" money because he owed her money for a radio that he previously had purchased from her. The government specifically waived the opportunity to cross-examine Petitioner.

At the conclusion of the second hearing, a character witness, who had been Petitioner's pastor for three years and who knew her well, testified on Petitioner's behalf as to her good moral character. In the pastor's opinion, Petitioner has never been involved with drugs. After the pastor's testimony, the hearing was adjourned.

## RELEVANT STATUTORY PROVISIONS

**[1]** To qualify for cancellation of removal under 8 U.S.C. § 1229b(b)(2) ("Special rule for battered spouse or child"), a provision added as part of the Violence Against Women Act of 1994 ("VAWA"),[2] Petitioner had to demonstrate that she met each of the following five criteria:

(1) that she had been "battered or subjected to extreme cruelty" by a spouse who is or was a United States citizen or lawful permanent resident;

(2) that she had lived continuously in the United States for the three years preceding her application;

(3) that she was a person of "good moral character" during that period;

(4) that she is not inadmissible or deportable under various other specific immigration laws relating to criminal activity, including 8 U.S.C. § 1182(a)(2); and

(5) that her removal "would result in extreme hardship" to herself, her children, or her parents.

8 U.S.C. § 1229b(b)(2)(A)(i)-(v). If Petitioner failed to establish *any one* of those criteria, she is not eligible for cancellation of removal under § 1229b(b)(2), *even if* she is a victim of domestic violence.

**[2]** The central issue in this case is whether Petitioner met the fourth criterion—specifically, whether she demonstrated

---

[2] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, Tit. IV (VAWA), subtit. G, § 40703, 108 Stat. 1796. After its enactment, the statute was amended to reflect the transition in immigration parlance from "suspension of deportation" to "cancellation of removal."

that she is not inadmissible under 8 U.S.C. § 1182(a)(2)(C), which relates to involvement in illegal drug trafficking.[3] Under § 1182(a)(2)(C), an alien is inadmissible if

> the . . . Attorney General knows or has *reason to believe* . . . [that the alien] is or has been an illicit trafficker in any controlled substance . . . or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so[.]

(Emphasis added.). Section 1182(a)(2)(C) does not require a conviction, but only a "reason to believe" that the alien is or has been involved in drug trafficking. *Lopez-Molina v. Ashcroft*, 368 F.3d 1206, 1209 (9th Cir. 2004). If Petitioner is inadmissible under § 1182(a)(2)(C), then she is ineligible for cancellation of removal under 8 U.S.C. § 1229b(b)(2)(A)(iv).

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review due process challenges to immigration proceedings. *Reyes-Melendez v. INS*, 342 F.3d 1001, 1006 (9th Cir. 2003). Claims of due process violations in removal proceedings are reviewed de novo. *Id.*

## DISCUSSION

Petitioner's eligibility for cancellation of removal focused on one question: who was telling the truth about Petitioner's alleged involvement in drug trafficking, Petitioner or Detective Bryant? Had the IJ believed Petitioner's explanation, then

---

[3]As the IJ and the BIA properly noted, involvement in drug trafficking, and presentation of false testimony regarding such involvement, also would preclude Petitioner from establishing "good moral character" as required by the third criterion, 8 U.S.C. § 1229b(b)(2)(A)(iii). The government does not argue that Petitioner fails to meet the remaining three statutory criteria.

she would have met the statutory criteria for relief. Instead, the IJ believed Detective Bryant, thereby rendering Petitioner ineligible for relief.

To answer that question, the IJ had to weigh Petitioner's credibility against the credibility of the detective and the credibility of the absent informant. We rarely disturb the result of that kind of balancing. But here, the IJ's assessment of Petitioner's credibility was skewed by prejudgment, personal speculation, bias, and conjecture; and his refusal to allow Petitioner to challenge those views by presenting expert testimony violated Petitioner's right to due process. We cannot assume that the IJ would have struck the same balance had the weighing begun on an even plane.

A. *The IJ improperly impugned Petitioner's credibility and prejudged the utility of expert testimony.*

1. *Speculation and bias about Petitioner's credibility*

The IJ stated, in his written decision, that "[e]ven before hearing the testimony of Detective Bryant, the Court had doubts about [Petitioner's] credibility."[4] Specifically, the IJ repeatedly expressed doubts about Petitioner's account of domestic violence. The IJ's skepticism centered around three key points: he doubted that Petitioner would stay with, or return to, Calzadillas if he were abusive; he doubted that Calzadillas would follow Petitioner if she did leave; and he doubted that Calzadillas could find Petitioner if he did wish to follow her.

---

[4]His first doubt was that "[h]er demeanor during testimony often sounded more like the recitation of a memorized story than a person actually recalling and reliving traumatic events." We rejected a very similar generalized statement, made by the very same immigration judge, as a basis for an adverse credibility determination in *Arulampalam v. Ashcroft*, 353 F.3d 679, 686 (9th Cir. 2003).

The IJ's most intense skepticism was directed at the third point, Calzadillas' ability to find Petitioner. Before Petitioner had even testified to the events in question, the IJ stated: "[I]t's just about impossible, if she didn't tell him. She must have communicated with him, otherwise, how could he have possibly figured out where she went?" The IJ observed that the Immigration and Naturalization Service[5] ("INS") commonly could not locate people against whom there were orders of removal and wondered how, given the INS's ability to lose people, Calzadillas could have tracked Petitioner down. In his written decision, the IJ regarded as "implausible" the "amazing ability of [Petitioner's] tormentors to locate her, though she traveled to the far corners of this country to escape."

The IJ also doubted that Calzadillas would have followed Petitioner in the first place. During a discussion, early in the hearing, of whether Calzadillas, who is originally from Mexico, would follow Petitioner to Honduras, the IJ said:

> I mean, it's not very persuasive that he is going to go back to a country, because he is so obsessed by her that he is going to follow her back to her country where . . . a foreign country where he doesn't even have a right to be and probably can't get a job, just so, you know, he can be close to her.

Finally, the IJ expressed disbelief that Petitioner would stay with an abusive partner. Petitioner explained that, during her time with Calzadillas in Texas (while she was pregnant, and then while she had a newborn daughter), she stayed at home while Calzadillas worked. The IJ asked: "Well, why didn't

---

[5]The INS ceased to exist on March 1, 2003, when its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. We refer to the agency as the INS because the hearings in this case took place before the transfer.

you escape then?" (She did, when her baby reached the age of six months.) Petitioner also testified that she, along with two of her children, returned to her Anchorage apartment after being treated for stab wounds inflicted by Calzadillas because she thought he had left and because they had nowhere else to go. When she returned, Petitioner asked Calzadillas to leave, but he refused. Later in the hearing, the IJ questioned whether someone who was afraid to tell hospital personnel about her abuse would be likely "to go back to the apartment where this drunk is waiting" or would have the gumption to tell the abuser to leave when she found him there. In his written decision, the IJ found it "implausible" that Petitioner would have returned to her apartment "if there truly had been a chance that a drunken abusive man with a knife was waiting there." He suggested several other destinations, including a park bench, that would have been preferable and concluded that Petitioner's "willingness to return to her apartment so soon after the alleged knifing event seriously detracted from her credibility as to the actual events of that evening."

These areas of skepticism are important for two reasons. First, they reveal the kind of speculation and bias that we have held to be improper bases for an adverse credibility determination.[6] *Cf. Kaur v. Ashcroft*, 379 F.3d 876, 885-87 (9th Cir.

---

[6]Another area in which personal conjecture determined the course of this proceeding, and influenced the IJ's credibility determination, pertains to Petitioner's relationship with Gomez-Mendoza, who was with Petitioner in the car on the day of her arrest. The IJ doubted that Gomez-Mendoza, a man in his forties, could have been the boyfriend of Petitioner's daughter (who was 23 years old at the time of Petitioner's arrest). Indeed, their age difference was the primary reason the IJ gave for calling Detective Bryant to testify after the government tried to withdraw its request:

> There were aspects of [Petitioner's] testimony which the Court found implausible and unpersuasive regarding the arrest, which the detective's testimony might clarify. . . . Gomez-[Mendoza] is apparently a middle-aged man, closer to the age of the respondent than her daughter, yet she testified that this man was her daugh-

2004) (reversing an adverse credibility determination in part because the IJ speculated that India would not have issued a passport with the name printed as "Ran*jit*," but signed as "Ran*jeet*," despite the explanation from the petitioner's counsel that the spellings were interchangeable); *Arulampalam v. Ashcroft*, 353 F.3d 679, 687 (9th Cir. 2003) (holding that the IJ improperly speculated that experienced soldiers would have been able to prevent the petitioner from bypassing checkpoints on his way out of his country, as he testified that he did); *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052 (9th Cir. 2002) (rejecting an IJ's speculation about the petitioner's "real" economic motives for wanting to leave her country); *see also Reyes-Melendez*, 342 F.3d at 1006 (holding that a neutral judge is among the most basic of due process protections); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) (stating that a due process violation occurs when an IJ prejudges a claim and fails to behave as a neutral fact-finder interested in hearing the petitioner's evidence).

Second, these areas of skepticism are important because they provide a context for the IJ's refusal to hear expert testimony, from professionals who had worked with Petitioner, regarding the dynamics of abusive relationships. *Cf. Zi Lin Chen v. Ashcroft*, 362 F.3d 611, 618 (9th Cir. 2004) (holding that, when the petitioner had been "denied a reasonable opportunity to explain what the IJ perceived as an inconsistency in her testimony," the "IJ's doubt about the veracity of her story [could not] serve as a basis for the denial of asylum").

---

ter's boyfriend. Her testimony did not have the ring of truth on this point . . . . If he is actually [Petitioner's] boyfriend, it would indicate that she lacked credibility, and would affect the merits of her claim as an allegedly abused person.

No evidence, including Detective Bryant's testimony, contradicted Petitioner's assertion that Gomez-Mendoza was her daughter's boyfriend; and their 20-year age difference is not so unusual that the IJ properly could have discounted the accuracy of Petitioner's testimony.

### 2.  *Doubts about the utility of expert testimony*

The IJ was of the preconceived view that expert testimony could do no more than repeat, uncritically, the victim's consistent—but potentially fabricated— story. ("You know, I mean, she talked to [Petitioner] and believes the story, basically, so you know, it's kind of bootstrapping then.") Indeed, the IJ observed that persons in need of services can be motivated to fabricate stories of domestic violence:

> But . . . the more she tells these stories, the more benefit she accrues from all of these agencies that are quite eager to help her in any way they can. And the more they hear, the more they [p]ile on the services. So there's always the possibility of someone embellishing in order to gain the kind of support. I'm not saying I don't believe her. Don't get me wrong.

*Cf. Sanchez-Cruz v. INS*, 255 F.3d 775, 779-80 (9th Cir. 2001) (observing that the IJ had focused with disapproval on the fact that the petitioner had received welfare). And, as for the experts' ability to discriminate between actual victims of domestic violence and people whose need flows from other sources, the IJ opined:

> [T]his type of people, they don't throw people out on the street. If someone comes in and says that they have been abused, if — if everything they observe in talking to them, hearing their case history is consistent with their story, they'll basically believe it.

Petitioner's counsel countered that the experts' live testimony could provide information relevant to the IJ's most critical areas of doubt, such as Calzadillas' desire and ability to follow Petitioner. Counsel also offered to question the experts regarding the intake criteria they use to determine whether someone has, in fact, been abused. She pointed out that none

of those issues had been addressed in the written materials previously provided by way of affidavits.

The IJ ultimately refused the live testimony, asserting that time was short: "I don't — I don't believe that I want to hear any testimony from the experts, because — mainly because of the lateness of the hour. If — you know, if we had more time, perhaps, but it is 4:30 and I don't think we could accomplish much in 30 minutes." The IJ assured Petitioner's counsel that he would consider the experts' written materials.

B. *The IJ's refusal to hear testimony from Petitioner's experts violated due process.*

**[3]** Due process principles prohibit an IJ from declining to hear relevant testimony because of a prejudgment about the witness's "credibility or the probative value of [the] testimony." *Kaur v. Ashcroft*, 388 F.3d 734, 737 (9th Cir. 2004). "We will grant a petition for review from a BIA decision on due process grounds if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting [his or her] case." *Reyes-Melendez*, 342 F.3d at 1006 (internal quotation marks omitted).[7] Whether the IJ's actions prevented the introduction of significant testimony is critical to the ultimate question whether the alien had a reasonable opportunity to present evidence. *See, e.g.*, *Sanchez-Cruz*, 255 F.3d at 779 (noting that the IJ "refused to allow the petitioner to introduce evidence that specifically contradicted some of his factual findings"); *Colmenar*, 210 F.3d at 971 (noting that the IJ cut off the alien's testimony regarding the possible political motivations of the attack against him).

In *Kaur*, an asylum seeker attempted to call her son, who had been granted asylum a year earlier, as a witness to the events that had caused her to leave her native country. The IJ

---

[7]As we will discuss in the next section, "[t]he alien must also show prejudice." *Reyes-Melendez*, 342 F.3d at 1006.

refused to hear his testimony because the son had been only 8 or 9 years old at the time of the relevant incidents. 388 F.3d at 736. The IJ then denied asylum, in part because of the absence of corroborative evidence. *Id.* We held that "[t]he IJ was not entitled to prejudge [the son's] credibility or the probative value of his testimony." *Id.* at 737. The testimony, for which there was no substitute, was relevant to corroborate the petitioner's testimony and to bolster her credibility. *Id.*

**[4]** In the circumstances of this proceeding, the IJ's refusal to hear testimony from Petitioner's experts likewise violated due process. In *Kaur*, of course, there was no substitute for the son's testimony, and the IJ there gave no reason for excluding the testimony other than a prejudgment of its value. *See id.* Here, the IJ gave two facially neutral reasons— efficiency and the superiority of written materials—for refusing the expert testimony. But the latter reason cannot suffice when the proffered testimony was *not* covered in the written materials and when it would have reflected directly on Petitioner's credibility, on specific points as to which the IJ repeatedly had expressed skepticism. And the IJ's claimed interest in efficiency was belied by the substantial amount of time the IJ spent arguing with Petitioner's counsel about *whether* to hear the testimony and by his willingness (indeed, insistence) to call, and to hold an additional hearing to receive testimony from, Detective Bryant.[8]

---

[8]The IJ's statements suggested that less neutral reasons also influenced his decision. In his discussion with Petitioner's counsel, the IJ appeared to discount the value of information about typical patterns of domestic violence as an aid in resolving inconsistencies and determining credibility in general:

> Well, we can figure that out, you know, that someone has to have an explanation as to why there is something inconsistent in the documentary evidence. . . . I mean, the type of thinking that you are projecting here would account for someone who nothing ever happened to them being eligible for this kind of relief. Well, it doesn't matter what they told the emergency room[,] they were afraid, you know.

**[5]** Petitioner was denied an opportunity to challenge the IJ's preconceived views that experts in the patterns of domestic violence could do no more than repeat, uncritically, the victim's testimony, and that evidence of such patterns was not a helpful supplement to the traditional tools for evaluating credibility. As we wrote in a slightly different context:

> [I]n enacting VAWA, Congress recognized that lay understandings of domestic violence are frequently comprised of "myths, misconceptions, and victim blaming attitudes," and that background information regarding domestic violence may be crucial in order to understand its essential characteristics and manifestations.

*Hernandez v. Ashcroft*, 345 F.3d 824, 836 (9th Cir. 2003) (quoting H.R. Rep. No. 103-395, at 24 (1993)).[9] In VAWA, Congress took steps to provide judges with training on the topics of rape and domestic violence. *See* Pub. L. No. 103-322, tit. IV, subtit. D, §§ 40411-40422. In support of that measure, Congress noted that "[a] judge who is confident in controlling his or her own life and circumstances . . . may find it difficult to understand the circumstances and responses of a battered woman." S. Rep. No. 103-138, at 46 (1993).

> Some judges and court personnel approach domestic violence cases, whether consciously or unconsciously, with assumptions based not on personal experience or the facts of a particular case but on stereotypes and biases. Judges and court personnel may also lack information about the psychological, economic, and social realities of domestic violence victims.

---

[9]In *Hernandez*, we were reviewing the agency's determination that the petitioner had not established the "extreme cruelty" requirement for suspension of deportation. 345 F.3d at 832-33.

*Id.* Congress, in other words, recognized that information about the dynamics of abusive relationships could help adjudicators evaluate facts more fairly. This recognition supports our conclusion that due process required the IJ to allow Petitioner to confront his overt skepticism with expert testimony on the issue of domestic violence.

C. *Petitioner suffered prejudice as a result of this due process violation and the IJ's improper speculation as to her credibility.*

**[6]** For us to grant the petition for review on due process grounds, Petitioner must show prejudice, "which means that the outcome of the proceeding *may have been affected* by the alleged violation." *Reyes-Melendez*, 342 F.3d at 1006 (emphasis added). The government argues that there is no prejudice because substantial evidence supports the IJ's finding that Petitioner was involved in drug trafficking, regardless of any mistakes the IJ may have made in evaluating the credibility of her testimony about domestic violence. That is, even if the IJ's improper assessment of Petitioner's credibility resulted in an incorrect conclusion as to her testimony about *domestic violence*, it did not affect his decision to credit the detective's testimony over Petitioner's with regard to the alleged *drug transaction*. We do not agree.

Petitioner and Detective Bryant presented conflicting testimony with regard to the alleged drug transaction. To review: In the initial hearing, Petitioner testified to her version of the events leading to her arrest, in which she was an innocent bystander. At the second hearing, Detective Bryant presented another version, relayed from an informant, in which Petitioner had held a rock of cocaine in her mouth, passed it to Gomez-Mendoza, and received half of the marked "buy" money in exchange. After Detective Bryant testified, in rebuttal Petitioner's counsel gave a detailed offer of proof to supplement Petitioner's earlier testimony. The offer of proof unequivocally denied any involvement in drug trafficking;

said that Petitioner needed a ride with her daughter's boyfriend because she lacked other transportation; and explained the presence of the money in her purse as payment for a radio, sold earlier to the boyfriend. Her previous testimony had included denial of specific charges (like holding cocaine in her mouth). The IJ accepted the offer of proof in lieu of Petitioner's live rebuttal testimony, and the government waived the right to cross-examine.

**[7]** The IJ's decision to believe Detective Bryant over Petitioner controlled the outcome of the proceeding. Our task is to determine whether the IJ's assessment of Petitioner's credibility regarding domestic violence, and his refusal to admit testimony that would have challenged his preconceived view of her credibility on that point, may have affected his resolution of the drug-related credibility dispute. On this record, we cannot conclude that the two issues were unconnected. The IJ's improper prejudgment on the first issue, which culminated in his refusal to hear testimony that might have bolstered Petitioner's credibility, infected his decision to believe Detective Bryant's testimony over Petitioner's. Our law has long recognized that a person who is deemed unbelievable as to one material fact may be disbelieved in all other respects. *See Hattem v. United States*, 283 F.2d 339, 343 (9th Cir. 1960) (approving, as a correct statement of the law, a jury instruction stating that, "[i]f you find that any witness in this trial has wilfully testified falsely as to any material fact in the case, then you are at liberty wholly to disregard all of the testimony of that witness"); *Shelton v. United States*, 169 F.2d 665, 667 (D.C. Cir. 1948) (discussing the maxim "falsus in uno, falsus in omnibus"). Petitioner's testimony regarding domestic violence came before the testimony regarding her arrest, and the IJ expressly stated that his credibility concerns began during the former. "Even before hearing the testimony of Detective Bryant," the IJ stated in his decision, he "had doubts about [Petitioner's] credibility."

Of course, we cannot be sure that the IJ would have reached a different conclusion about the drug transaction had

he begun with a more neutral view of Petitioner's credibility. But our cases do not require absolute certainty. *See, e.g.*, *Agyeman v. INS*, 296 F.3d 871, 884 (9th Cir. 2002) ("Prejudice is shown if the violation *potentially* . . . affects the outcome of the proceedings." (internal quotation marks omitted)). In this proceeding, everything came down to resolving a conflict in testimony; and the IJ's earlier-developed, improperly negative view of Petitioner's credibility may have affected his later conclusion that it was Petitioner, not the detective (or the informant), who lied about the drug transaction. That conclusion, as we have said, controlled the outcome.

**[8]** Today's decision by no means refutes the self-evident proposition that one can be both a victim of domestic violence and a drug trafficker. If the agency properly concludes that there is reason to believe an alien is a drug trafficker,[10] then the alien is ineligible for cancellation of removal under 8 U.S.C. § 1229b(b)(2), period. But, before reaching that conclusion, the agency must give the alien a fair hearing in front of a neutral decision-maker. Because the IJ's disbelief of Petitioner rested on personal speculation, bias, conjecture, and prejudgment, and because he refused to hear testimony that would have challenged those assumptions, we decline to assume that a fair and neutral balancing of the conflicting testimony occurred or to assume that a fair and neutral balancing necessarily would have yielded the same answer. Thus, we conclude that Petitioner has demonstrated prejudice.

**[9]** We do not suggest that the agency was or is required to credit Petitioner's version of events uncritically. We merely hold that the IJ was required to hear testimony from Petitioner's experts in the subject of domestic violence, as to matters

---

[10]"The appropriate way of measuring whether the IJ and BIA had 'reason to believe' " that a petitioner is involved in drug trafficking is to assess "whether substantial evidence supports such a conclusion." *Alarcon-Serrano v. INS*, 220 F.3d 1116, 1119 (9th Cir. 2000).

pertaining to her credibility. Thus, we remand for a new hearing, to ensure that Petitioner has a full and fair opportunity to establish her credibility, *Kaur*, 388 F.3d at 738 (remanding for a new hearing), and we suggest that the new hearing be held before a different immigration judge, *Perez-Lastor v. INS*, 208 F.3d 773, 783 (9th Cir. 2000).[11]

PETITION GRANTED; REMANDED with instructions.

---

[11]Because we remand for a new hearing on the ground discussed, we need not and do not reach Petitioner's other arguments about the procedures below.