**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| OLAKUNLE OSHODI, AKA Bode Okeowo, AKA Olakunle Akintola Oshodi, AKA Olakunle Akintola Akinbayo Oshodi, AKA Isaac Oliver Alger, AKA Curtis Evans, AKA Bode Olacune Okeowo, AKA Isaac Okeowo, *Petitioner*, | No. 08-71478 Agency No. A023-484-662 |
| v. | OPINION |
| ERIC H. HOLDER, JR., Attorney General, *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted En Banc
December 11, 2012—Pasadena, California

Filed August 27, 2013

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Kim McLane Wardlaw, William A. Fletcher, Ronald M.
Gould, Richard A. Paez, Johnnie B. Rawlinson, Jay S.
Bybee, Milan D. Smith, Jr., Mary H. Murguia, and
Morgan Christen, Circuit Judges.

Opinion by Judge Paez;
Dissent by Chief Judge Kozinski

**SUMMARY**[*]

**Immigration**

The en banc court granted a petition for review of the denial of withholding of removal and protection under the Convention Against Torture in a case in which the petitioner asserted that the immigration judge violated his right to due process by limiting his testimony at his merits hearing and then denying relief on adverse credibility grounds.

The en banc court held that applicants for asylum and withholding of removal have a due process right to testify fully as to the merits of their application. The en banc court explained that the IJ's refusal to hear petitioner's full testimony with respect to the abuses he suffered in Nigeria was particularly troublesome because the denial of relief rested solely on an adverse credibility finding, and the limitation of testimony hampered the IJ's ability to judge the totality of the circumstances, including petitioner's demeanor, candor or responsiveness, and the consistency between petitioner's oral testimony with his written declaration.

The en banc court held that the IJ's actions caused petitioner prejudice because the outcome turned entirely upon

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

petitioner's credibility. The en banc court remanded for a new hearing before an immigration judge.

Dissenting, Chief Judge Kozinski, joined by Judges Rawlinson and Bybee, wrote that the majority's ruling was wholly unnecessary because the IJ did not preclude petitioner from testifying, and even assuming the IJ limited the testimony, there is no due process right to give live testimony at every administrative hearing where important property or liberty interests are at stake. Chief Judge Kozinski also wrote that petitioner in this case failed to demonstrate that the IJ's actions caused him prejudice.

## COUNSEL

Marc Van Der Hout (argued) and Lisa Weissman-Ward, Van Der Hout, Brigagliano & Nightingale, LLP, San Francisco, California, for Petitioner.

John W. Blakeley (argued), Donald E. Keener, and Stuart F. Delery, United States Department of Justice, Civil Division, Washington, D.C., for Respondent.

Gwendolyn M. Ostrosky and Lawrence A. Cox, Arnold & Porter LLP, Los Angeles, California, for Amici Curiae Lawyer's Committee for Civil Rights, and Center for Gender and Refugee Studies.

Julian L. Andre and Matthew J. Smith, McDermott Will & Emery LLP, Los Angeles, California, for Amici Curiae National Immigrant Justice Center and American Immigration Lawyers Association.

# OPINION

PAEZ, Circuit Judge:

Olakunle Oshodi petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") decision finding him not credible and denying his application for withholding of removal and protection under the Convention Against Torture ("CAT").[1] Oshodi argues, *inter alia*, that the IJ violated his due process rights by denying him the opportunity to testify about the events of his past persecution in Nigeria while also finding him not credible and failing to give him notice before relying on lack of corroboration in the adverse credibility decision. He also argues that the IJ's credibility analysis violated the REAL ID Act and was not supported by substantial evidence. A three-judge panel of this court rejected Oshodi's due process arguments and, reaching the merits of the IJ's credibility determination, concluded that it complied with the REAL ID Act and was supported by substantial evidence. We granted rehearing en banc.

We hold that the IJ violated Oshodi's due process rights at his removal hearing by cutting off his testimony on the events of his alleged past persecution in Nigeria that are the foundation of Oshodi's withholding of removal and CAT claims. The IJ's refusal to admit Oshodi's testimony is particularly troublesome since Oshodi was denied relief solely on the basis of the IJ's adverse credibility finding. It is well established that live testimony is critical to credibility

---

[1] Oshodi does not challenge the denial of his asylum application as untimely.

determinations. Thus, the IJ's restrictions on Oshodi's testimony precluded the IJ from conducting a proper "totality of the circumstances" credibility analysis. Because we conclude that Oshodi did not receive a full and fair hearing as guaranteed by the Fifth Amendment, we grant the petition and remand for a new hearing. We therefore do not reach Oshodi's other arguments.

## BACKGROUND

Olakunle Oshodi, a Nigerian national, has resided in the United States since 1981. He is married to a United States citizen, and has a United States citizen daughter.[2] He originally entered the United States on a student visa in 1978. In 1981, after his visa expired, Oshodi was removed to Nigeria. He remained in Nigeria for two months and while there he claims he was detained, beaten, and tortured by the Nigerian authorities on at least two occasions on account of his political activities.

In a declaration attached to his asylum application, Oshodi stated that he was exposed to Nigerian politics, and related persecution, at an early age through his politically active mother. According to his declaration, on one occasion his mother was badly burned by molotov cocktails thrown at her by government agents. Soon after, she was killed by officers of General Gowon, the head of state from 1966 to

---

[2] Oshodi is ineligible for adjustment of status through these relationships because an adjustment petition was not filed until 2005 and Oshodi entered the United States without inspection. INA § 245(I), 8 U.S.C. § 1255(I).

1975.[3]  As a teenager, he joined the National Association of Nigerian Students ("NANS"), a political group initially formed to oppose General Obasanjo, leader of the military regime in power at the time and later president of Nigeria from 1999 to 2007.[4]

But it was not until his return to Nigeria in 1981 that Oshodi experienced direct persecution by the government. As Oshodi recounted in his declaration, he reentered Nigerian politics upon his return by joining the Unity Party of Nigeria, a political party affiliated with NANS.  At his first rally, police officers forcefully disbanded the peaceful protest with tear gas and swagger canes.  Although Oshodi escaped, many of his colleagues were detained and tortured.  In the following weeks, however, Oshodi experienced two incidents of severe persecution at the hands of Nigerian officials.

On February 8, 1981, Oshodi and his colleague Doyin Odunuga were stopped at a police checkpoint.  When the police officers saw their political propaganda, the police immediately ordered them out of the car, at which point Odunuga sped away.  The officers shot at the car, hit Odunuga, and the car crashed.  The officers pulled Oshodi and Odunuga out of the car and beat them.  Odunuga was eventually sent to the hospital, where he died from his injuries eight days later.  Meanwhile, Oshodi was detained in jail and interrogated.  According to Oshodi's declaration, the officers "tortur[ed him] with different techniques," beat him

---

[3] Oshodi offered his mother's death certificate as corroborating evidence of this claim but the IJ refused to admit it as not properly authenticated.

[4] At the time of Oshodi's hearing, General Obasanjo was campaigning for a third term as President.

unconscious with swagger canes, and deprived him of food for two days. Ultimately, his uncle paid a bribe of $2,000 to obtain his release but Oshodi was assigned to weekly monitoring, the violation of which would trigger an "open warrant" for his arrest. Because of his continued political activity, Oshodi violated the monitoring requirement.

The following week, after driving a fellow party member to the airport, Oshodi was pulled over and detained by five officers. He was handcuffed, blindfolded, and driven to an unknown location. The officers shot him in the foot, burnt him with cigarettes, shocked him with electricity, and beat him with their pistols. They stripped him naked and doused him with gasoline, threatening to burn him alive. They sodomized him with swagger canes and dirty bottles. After they finished, the officers left him on the side of the road, where passers-by discovered him and took him to the hospital. At that point, Oshodi decided he could no longer safely remain in Nigeria and fled to the United States.[5]

In light of these events in Nigeria, Oshodi sought asylum, withholding of removal, and CAT relief; however, at his removal hearing, Oshodi was precluded from testifying about these incidents of persecution and torture. After Oshodi began to discuss the first political rally he attended, a precursor to the two events of severe persecution and torture

---

[5] In addition to his declaration, Oshodi offered into evidence police reports regarding both events of persecution and medical records from Nigeria confirming that he suffered a gunshot wound and other injuries after the second event. The IJ refused to admit these documents as not properly authenticated. A forensic medical report prepared in the United States and a newspaper article directly referring to Oshodi's persecution at the airport were entered into evidence but were not addressed by the BIA in its decision.

in his declaration, the IJ cut off the direct examination by his attorney. The IJ directed Oshodi to limit his testimony to events not discussed in his asylum application, apparently on the notion that the declaration was sufficient for him to judge the veracity of the events as described therein:

> I'll tell you what. I've read the statements of the respondent, read his application. I've gone over the materials. I'm not looking for everything to simply be repeated. I mean I understand that there needs to be testimony concerning [the] application, but if you have something to add to what was there, fine; otherwise, I don't need it line by line, okay?

Oshodi's attorney followed the IJ's directive.[6] As a result,

---

[6] We respectfully disagree with the dissent's characterization of the IJ's statement as a "tame exhortation," "encourag[ing]" Oshodi's lawyer to "[m]ove it along, counselor." Dissent at 31, 32, 33. The dissent argues that the phrase "I don't need it line by line, okay?" somehow makes it clear that the IJ intended to allow some repetitive testimony. Dissent at 33. Indeed, the dissent goes on to state that "[n]othing the IJ said precluded Oshodi from giving a vivid oral account of the incidents of persecution he allegedly suffered." Dissent at 33. We disagree. To the contrary, it was only when Oshodi began to give a "vivid oral account" of his persecution that the IJ intervened in the presentation of Oshodi's testimony.

The IJ admonished Oshodi and his lawyer that "if you have something to add to what was there, fine; otherwise I don't need it line by line, okay?" We read this statement as instructing Oshodi's lawyer not to elicit testimony about matters already covered in the application. Oshodi's lawyer clearly understood the directive in this manner as well. Before the IJ's directive, Oshodi's lawyer was asking Oshodi a series of chronological questions about Oshodi's persecution in Nigeria. After the

Oshodi did not testify about the key events of persecution and torture that form the foundation of his claims for withholding of removal and CAT relief.

The remainder of Oshodi's direct testimony was devoted mostly to clarifying a point from the expert's testimony, that it was his membership in the Unity Party of Nigeria, not NANS, that led to his persecution in 1981. At one point, Oshodi's attorney again attempted to question him about his encounters with the Nigerian police. As Oshodi began to answer, the IJ interjected, "Counsel, do you have a specific question for the respondent to answer because right now I don't know what he's answering."[7] With that admonishment, Oshodi's counsel wrapped up his direct examination by asking Oshodi only if he felt he would be safe if he returned to Nigeria or if he could travel within Nigeria to escape the persecution and torture that he feared. Without asking Oshodi any direct questions about his encounters with the Nigerian authorities, Oshodi's counsel ended his examination: "Nothing further, Your Honor. We submit on the basis of the testimony of the respondent, as well as the

IJ intervened, Oshodi's lawyer stopped this line of questioning and only asked Oshodi if he had anything to say "in addition to what was already previously submitted in [his] application and [his] statement." Oshodi's lawyer plainly did not understand the IJ's directive as merely a request for Oshodi not to repeat himself "line by line" but rather an instruction to elicit testimony only about events not included in the application. We understand it in the same way.

[7] The dissent takes issue with our characterization of this exchange. The full exchange is replicated in the dissent. Dissent at 34–35. We do not claim that this exchange alone would suggest that the IJ barred any of Oshodi's testimony. Rather, we note this exchange to highlight the fact that Oshodi never actually testified to the events of his persecution.

documents that are presented." The entirety of Oshodi's direct examination covers fewer than ten pages of transcript.

During cross-examination, the government's attorney asked Oshodi several yes or no questions about the events discussed in his declaration, but did not allow him to explain these events:

> Q: And the person who was driving sped through the checkpoint, is that correct, at one point?
>
> A: My application said that.
>
> Q: Is that true? Is that what happened?
>
> A: Yeah, but can you ask me what happened before that?
>
> Q: I'll ask the questions, please. You went to the checkpoint, is that correct?
>
> A: Uh-huh, that's correct.
>
> Q: You stopped for a bit?
>
> A: Yes, counselor.
>
> Q: Your person behind the wheel got scared and sped off, is that correct?
>
> A: No, that's wrong.

The government quickly moved on without affording Oshodi the opportunity to elaborate on what actually happened. The IJ had already warned Oshodi to answer the government's questions directly and not to "expand" on them. The remainder of his testimony did not address the substance of his asylum claim, but focused on peripheral issues related to his credibility, such as the number of his siblings, his failure to apply for asylum earlier, and his prior criminal record.

The IJ recognized that Oshodi's application, if taken as true, established past persecution. The IJ, however, found Oshodi not credible—without ever hearing Oshodi testify about the events involving his persecution—on the basis of his use of aliases, his failure to provide the corroborating evidence, and various inconsistencies between his testimony, his initial credible-fear interview, and his asylum application. On this basis, he denied Oshodi's withholding of removal and CAT claims. The BIA affirmed the IJ's decision and rejected Oshodi's due process claim that the IJ denied him an opportunity to testify fully in support of his application for relief. The BIA reasoned that there was no due process violation because, following the IJ's directive limiting Oshodi's testimony, Oshodi's attorney asked Oshodi if he had anything to add to his written application and Oshodi briefly testified further about additional, albeit peripheral, details of his application.[8]

---

[8] Pursuant to the parties' stipulation, Oshodi's initial petition for review was remanded to the BIA for consideration of the impact of the REAL ID Act on the corroboration and credibility issues in this case. On remand, the BIA reaffirmed its previous decision.

## ANALYSIS

### A.

Unlike challenges to the merits of an IJ's decision, which we review under the deferential substantial evidence standard, we review de novo due process claims in removal proceedings. *See Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000). It is well established that the Fifth Amendment guarantees non-citizens due process in removal proceedings. *Id.*; *see also Reno v. Flores*, 507 U.S. 292, 306 (1993) (citing *The Japanese Immigrant Case*, 189 U.S. 86, 100–01 (1903)). Therefore, every individual in removal proceedings is entitled to a full and fair hearing. *Colmenar*, 210 F.3d at 971 (citation omitted). A vital hallmark of a full and fair hearing is the opportunity to present evidence and testimony on one's behalf. *Id.*; *see also Vargas-Hernandez v. Gonzales*, 497 F.3d 919, 926–27 (9th Cir. 2007) ("Where an alien is given a full and fair opportunity . . . to present testimony and other evidence in support of the application, he or she has been provided with due process."); *Shoaira v. Ashcroft*, 377 F.3d 837, 842 (8th Cir. 2004) ("For a deportation hearing to be fair, an IJ must allow a reasonable opportunity to examine the evidence and present witnesses.").

Indeed, where an applicant is not represented, the IJ has an affirmative duty to ensure that the record is fully developed for the benefit of the applicant. *Jacinto v. INS*, 208 F.3d 725, 734 (9th Cir. 2000). The statutory and regulatory regime also protects an alien's right to present evidence and testimony on his behalf in removal proceedings, including his own testimony. 8 U.S.C. § 1229a(b)(4)(B) ("[T]he alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own

behalf, and to cross-examine witnesses presented by the Government . . . ."); 8 C.F.R. § 1240.1(c) ("The immigration judge shall receive and consider material and relevant evidence . . . .").

In any contested administrative hearing, admission of a party's testimony is particularly essential to a full and fair hearing where credibility is a determinative factor, as it was here. *Mathews v. Eldridge*, 424 U.S. 319, 343–44 (1976) (noting that where credibility and veracity are critical to the decision-making process "written submissions are a wholly unsatisfactory basis for decision" (quoting *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970))). Contrary to this essential aspect of a full and fair hearing, Oshodi was not provided a reasonable opportunity to present evidence on his behalf. In particular, the IJ precluded him from providing critical testimony about the events of persecution that are the foundation of his withholding of removal and CAT claims. Oshodi's declaration relates that he was subjected to brutal torture, including detention without food, severe beatings, sodomy, and a gun shot to his foot. He claims that he was stripped naked, doused with gasoline, and threatened with being burned alive. But he testified to none of those things because of the IJ's directive. Instead, the testimony circled around peripheral issues such as his relationship with his estranged father and the number of his siblings and half-siblings. On this record, the IJ determined that Oshodi was not credible and thus the events related in his declaration should be deemed not credible as well.

The importance of an asylum or withholding applicant's testimony cannot be overstated, and the fact that Oshodi submitted a written declaration outlining the facts of his persecution is no response to the IJ's refusal to hear his

testimony. An applicant's testimony of past persecution and/or his fear of future persecution stands at the center of his claim and can, if credible, support an eligibility finding without further corroboration. 8 U.S.C. § 1158(b)(1)(B)(ii); 8 C.F.R. § 1208.13(a). Every asylum and withholding applicant is *required* to be examined under oath as to the contents of his application. 8 C.F.R. § 1240.11(c)(3)(iii).

The BIA has held that it is reversible error for an IJ to adjudicate an alien's application for asylum and withholding of removal without at least placing the applicant under oath and questioning him "as to whether the information in the written application is complete and correct." *Matter of Fefe*, 20 I. & N. Dec. 116, 118 (BIA 1989). Moreover, the BIA explained that in nearly all cases, a more in-depth oral examination of the asylum applicant is pivotal to a fair asylum proceeding: "In the ordinary course . . . we consider the full examination of an applicant to be an essential aspect of the asylum adjudication process for reasons related to fairness to the parties and to the integrity of the asylum process itself." *Id.* The BIA stressed the importance of a full examination *in addition to* a written application: "It is difficult for an alien to satisfy [the asylum] standard unless he presents testimony at his hearing which is consistent with and corroborates any previous written statements in his [application]." *Id.*

Thus, by refusing to allow Oshodi to testify to the contents of his written application, the IJ violated Oshodi's due process right to present oral testimony about the events at the heart of his claim for withholding of removal, testimonial evidence that the BIA has recognized is central to the "integrity of the asylum process itself." *Id.* The foregoing was precisely our holding in *Colmenar*, 210 F.3d

at 971–72.  In that case, as in this one, the IJ "refused to let Colmenar testify about anything that was included in his written application." *Id.* at 971.  We held that the "IJ's conduct was directly contrary to the BIA's decision in *Matter of Fefe*" and found that the IJ improperly precluded Colmenar from presenting evidence on his behalf, in violation of due process.  *Id.* at 971–72.

We similarly found a due process violation in *Zolotukhin v. Gonzales*, 417 F.3d 1073, 1075–76 (9th Cir. 2005), where the IJ "den[ied] Zolotukhin a full and fair opportunity to present evidence on his behalf" by cutting off Zolotukhin's testimony about his family's past persecution in Russia and refusing to admit testimony of family members and an expert.  On other occasions, we have found a due process violation where the IJ did not exclude any of the applicant's testimony—which, as established above, has special significance—but excluded other expert or corroborating testimony.  *See Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1057–58 (9th Cir. 2005) (holding that the IJ's refusal to hear petitioner's experts' testimony violated due process); *Kaur v. Ashcroft*, 388 F.3d 734, 737–38 (9th Cir. 2004) (holding that the IJ's exclusion of petitioner's son's testimony violated due process).  The critical question is "[w]hether the IJ's actions prevented the introduction of significant testimony." *Lopez-Umanzor*, 405 F.3d at 1056.  The answer here is clearly yes.[9]

---

[9] Nothing in our decision curtails the IJ's ordinary discretion to limit testimony in order to "focus the proceedings and exclude irrelevant evidence." *Kerciku v. INS*, 314 F.3d 913, 918 (7th Cir. 2003).  The IJ simply cannot do so in a wholesale manner that precludes the applicant from fully and fairly testifying as to the contents of his application.

The basic premise that applicants for asylum and withholding of removal have a due process right to testify fully as to the merits of their application is not unique to our circuit. In *Kerciku v. INS*, 314 F.3d 913, 918 (7th Cir. 2003) (per curiam), the Seventh Circuit made clear that when the IJ "bar[s] complete chunks of oral testimony that would support the applicant's claims," he violates the applicant's due process rights. *See also Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 539–40 (7th Cir. 2005) (concluding that the applicant was denied due process when the IJ not only repeatedly interrupted the applicant during her testimony but also prevented her from presenting expert testimony); *Podio v. INS*, 153 F.3d 506, 510–11 (7th Cir. 1998) (holding that the IJ violated applicant's due process rights by refusing to allow him to testify fully and excluding corroborating testimony).[10] In *Kerciku*, the IJ cut off Kerciku's direct testimony after he had testified only to a few peripheral issues. Thus, the IJ improperly "bar[red] complete chunks of [his] oral testimony." 314 F.3d at 918. This was true even though Kerciku filed a written application outlining his asylum claim in detail. *Id.* at 915–16. By barring any testimony repetitive of Oshodi's written application, the IJ improperly "bar[red] complete chunks of [his] oral testimony" that would have supported his claim. *See id.* at 918.

The IJ's refusal to hear Oshodi's full testimony with respect to the abuses he suffered in Nigeria is particularly

---

[10] The Third Circuit reached a similar conclusion in a case where the IJ improperly excluded evidence during a removal proceeding. *See Cham v. Att'y Gen.*, 445 F.3d 683, 694 (3d. Cir. 2006) (holding that the IJ denied applicant due process because, *inter alia*, he refused to consider corroborating evidence and refused to continue the hearing in order to allow the testimony of additional witnesses).

unacceptable given that the basis for the IJ's denial of relief rested solely on an adverse credibility finding.  In making a credibility determination, the IJ is to consider the "totality of the circumstances," including:

> [T]he demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii).  Where, as here, the IJ does not allow the applicant to testify fully as to the merits of his application, the IJ's ability to make a credibility determination based on the above factors is severely hampered.  The IJ did not have the opportunity to judge Oshodi's "demeanor, candor, or responsiveness" while testifying about the events of persecution and torture that he experienced, nor did the IJ have the ability to compare for consistency his oral presentation of those events to the way he described them in his written declaration.  *See id.*

The importance of live testimony to a credibility determination is well recognized and longstanding. *See, e.g.*, *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012) ("The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes. Rather, live testimony is the bedrock of the search for truth in our judicial system."); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility."); *see also United States v. 1998 BMW "I" Convertible*, 235 F.3d 397, 400 (8th Cir. 2000) ("[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity—or lack thereof."). Precisely because of the importance of live testimony to credibility determinations, we have held, as a matter of constitutional due process, that when a magistrate judge makes a report and recommendation on a motion to suppress evidence, the district judge may not reject the magistrate judge's credibility findings without conducting his own evidentiary hearing. *United States v. Ridgway*, 300 F.3d 1153, 1157 (9th Cir. 2002). We also applied this rule to magistrate judges' credibility determinations in habeas *Batson* claims. *Johnson v. Finn*, 665 F.3d 1063, 1075–76 (9th Cir. 2011). In so holding, we explained that this requirement ensures that any factual determination "will be the result of first-hand observations of witnesses and evidence." *Id.* at 1072.

Indeed, the rationale behind the substantial deference we give to agency credibility determinations is that IJs "are in the best position to assess demeanor and other credibility cues that we cannot readily access on review." *Shrestha v. Holder*,

590 F.3d 1034, 1041 (9th Cir. 2010); *see also* H.R. Rep. No. 109-72, at 167 (Conf. Rep. on REAL ID Act of 2005) ("An immigration judge alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence. He [or she] is, by virtue of his [or her] acquired skill, uniquely qualified to decide whether an alien's testimony has about it the ring of truth." (quoting *Sarvia-Quintanilla v. INS*, 767 F.2d 1387, 1395 (9th Cir. 1985))). We defer to a trial court's credibility determinations for the same reason. *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.").[11]

In light of the foregoing, it makes sense that the only exception the BIA has recognized to its general rule that an applicant for asylum or withholding of removal should be

---

[11] The dissent faults our reliance on *Anderson*, claiming that it does not stand "for the proposition that special deference is owed a trial court's credibility determination because it is best able to evaluate demeanor during live testimony" but rather stands for the "contrary position." Dissent at 44. We recognize that the Court stated that "the rationale for deference to the original finder of fact *is not limited* to the superiority of the trial judge's position to make determinations of credibility." *Anderson*, 470 U.S. at 574 (emphasis added). True enough. But it then said that appellate courts owe "even greater deference" when findings are based on credibility determinations. *Id.* at 575. Try as it might, the dissent simply cannot refute the clear and repeated holdings of the Court that live testimony is critical to credibility matters. *Anderson*'s indication that we owe deference to trial courts for other reasons is of no consequence.

fully examined on his application is when both parties stipulate that the testimony would be both consistent with the written statement *and believable.* *Matter of Fefe*, 20 I. & N. Dec. at 118. There was no such stipulation in this case, and the IJ did not find Oshodi's declaration believable.

By precluding Oshodi from testifying about the critical events in his application, the IJ short-circuited his ability to judge accurately Oshodi's credibility. To do so properly, he must consider the "totality of the circumstances," yet here, the IJ restricted the evidence, especially the evidence most relevant to credibility, such as demeanor and the consistency of testimony. Without hearing Oshodi's testimony about the persecution he suffered in Nigeria, and judging his demeanor and consistency during that testimony, the IJ determined that Oshodi was not credible and therefore that the contents of Oshodi's written declaration should not be credited. In doing so, the IJ improperly "prejudg[ed] . . . the [] 'credibility or the probative value'" of that testimony. *Lopez-Umanzor*, 405 F.3d at 1056 (quoting *Kaur*, 388 F.3d at 737).

In *Shrestha*, we held that "an IJ [must] not cherry pick solely facts favoring an adverse credibility determination while ignoring facts that undermine that result." 590 F.3d at 1040. Here, however, the IJ paid little heed to the principle recognized in *Shrestha*. Although the IJ had the benefit of the government's cross-examination of Oshodi regarding the alleged inconsistencies in his application and other factors weighing against his credibility, the IJ did not have the benefit of Oshodi's testimony regarding the central events underlying his application. The IJ was unable to judge Oshodi's demeanor and the nature of his testimony while he testified about the events of his persecution, the veracity of which were critical to the merits of his application. The IJ

cannot avoid considering all relevant factors and evidence in making a credibility determination by refusing to hear significant evidence in the first place. *See id.* ("[An] IJ cannot selectively examine evidence in determining credibility, but must present a reasoned analysis of the evidence as a whole." (quoting *Hanaj v. Gonzales*, 446 F.3d 694, 700 (7th Cir. 2006))).

Despite the forgoing, the BIA rejected Oshodi's due process claim because, after the IJ's directive not to testify to the contents of his declaration, Oshodi's attorney asked him if he had anything further to add, and Oshodi testified to a few additional details. Oshodi's attorney, however, phrased his questions to Oshodi to comply with the IJ's directive and avoided eliciting testimony regarding the events discussed in his application: "Is there anything that you would like to add in addition to what was already previously submitted in your asylum application and your statement that you submitted to the Court?" In response, Oshodi reasonably avoided testifying about the events described in his application and used that opportunity only to clarify a detail discussed in his expert witness's testimony. At no point did the IJ modify or reconsider his earlier directive and affirmatively allow Oshodi to testify about the contents of his application.

Thus, although Oshodi's attorney elicited some additional testimony outside the scope of the restrictions imposed by the IJ, Oshodi was still precluded from testifying about the events described in his application. The end result of the IJ's restriction on Oshodi's testimony was that it "prevented the introduction of significant testimony," *Lopez-Umanzor*, 405 F.3d at 1056, that was critical to the merits of his application. In *Colmenar*, which presented a very similar factual scenario, we rejected the BIA's reasoning in this case. 210 F.3d at 972.

The IJ cut off Colmenar's direct testimony but, at the close of his testimony, the government attorney and IJ asked him if he had anything to add.  *Id.*  We found those cursory questions insufficient to cure the IJ's previous refusal to allow Colmenar to testify to the contents of his written application.  *Id.*    That Oshodi testified to some facts regarding his application after the IJ's instruction does not cure the IJ's refusal to admit testimony on the most significant events underlying Oshodi's withholding of removal and CAT claims—testimony which was critical to the IJ's credibility analysis.

## B.

The dissent faults our due process analysis for failing to begin by conducting the balancing test outlined in *Mathews v. Eldridge*.  The dissent, however, skips over the fact that our circuit, as well as other circuits, has already determined that a due process right to present oral testimony in asylum cases exists, especially in cases that hinge on credibility.  *See, e.g.*, *Colmenar*, 210 F.3d at 971–72; *Kerciku v. INS*, 314 F.3d at 918.  Nonetheless, a *Mathews* analysis only supports our conclusion.  Under *Mathews*, we determine what process is due by balancing (1) the private interest at stake, (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional . . . safeguards," and (3) the government's interest, including the burdens of any additional process.  424 U.S. at 335.

The first factor weighs heavily in Oshodi's favor.  We have consistently recognized that deportation is a "particularly severe penalty."  *Padilla v. Kentucky*, 130 S. Ct. 1473, 1481 (2010) (internal quotation marks omitted); *see*

*also Landon v. Plascencia*, 459 U.S. 21, 34 (1982) ("Plasencia's interest here is, without question, a weighty one. She stands to lose the right to stay and live and work in this land of freedom. Further, she may lose the right to rejoin her immediate family, a right that ranks high among the interests of the individual.") (internal quotation marks and citation omitted). In the case of an asylum and withholding of removal applicant, the private interest could hardly be greater. If the court errs, the consequences for the applicant could be severe persecution, torture, or even death. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is always a harsh measure; it is all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country.").

The second factor in the *Mathews* balancing test is the adequacy of the challenged procedure: in this case, the denial of an asylum applicant's ability to testify about the contents of his asylum and withholding application when the merits of his case hinges on his credibility. This factor also weighs in Oshodi's favor. The dissent relies heavily upon *FDIC v. Mallen*, 486 U.S. 230 (1988), to support its argument that oral testimony was not required in this case. Dissent at 37–39. *Mallen*, however, is entirely consistent with our holding that due process entails a right to present oral testimony in asylum and withholding cases that turn on credibility determinations. In *Mallen*, the plaintiff brought a due process challenge to a statute that did not provide for an unfettered right to oral testimony in a different setting altogether, a post-suspension hearing on an FDIC decision to suspend from office an indicted official of a federally insured bank. *Id.* at 232. In rejecting the challenge, the Court explicitly assumed that due process would sometimes require oral testimony:

> [W]e may assume that there are
> post-suspension proceedings under § 1818(g)
> in which oral testimony is essential to enable
> the hearing officer to make a fair appraisal of
> the impact of a suspended officer's continued
> service on the bank's security and reputation.

*Id.* at 247. The Court rejected the facial challenge to the statute on the narrow ground that the hearing officer should have been given the opportunity to decide whether to hear oral testimony in that case. *Id.* The Court concluded that the officer may have decided to hear the testimony, or may have properly rejected it as unnecessary under the circumstances of that case. *Id.*

We agree that *Mallen* stands for the proposition that oral testimony is not *always* required in administrative proceedings. *Id.* at 247–48; Dissent at 39. But such an unsurprising holding is of little consequence here. Indeed, this proposition is established by *Mathews*. 424 U.S. at 349. *Mallen* also unremarkably suggests that, in some administrative proceedings and under certain circumstances, the fact that the material was "adequately covered by the written submissions" might be a valid reason for denying oral testimony. 486 U.S. at 247. But *Mallen* also stands for the proposition that, in some cases, due process likely requires the admission of oral testimony. *Id.* It is our task, under *Mathews*, to determine what process is due in an asylum and withholding hearing, where credibility is a paramount consideration. The Court's holding that oral testimony *may* not be required in every post-suspension hearing of a bank official is not at all inconsistent with our holding today that due process requires the admission of oral testimony in an

asylum and withholding hearing wherein the applicant's eligibility for relief turns on his credibility.

In determining whether oral testimony should be required in any particular case, we must consider "the risk of an erroneous deprivation of [the private interest] through the procedures used, and the probable value, if any, of additional . . . safeguards." *Mathews*, 424 U.S. at 335. *Mathews* provides guidance for when oral testimony is valuable under this prong: the touchstone is, unsurprisingly, the importance of credibility determinations to the type of case presented. In *Matthews*, the Court explained that an evidentiary hearing complete with oral testimony was not required before the termination of disability benefits because such cases primarily turn on "routine, standard, and unbiased medical reports by physician specialists" and, therefore, ordinarily "the specter of questionable credibility and veracity is not present." *Id.* at 344 (internal quotation marks omitted).[12] Credibility was the key distinction between *Mathews* and *Goldberg*, a case where the Court found that due process required an evidentiary hearing and the admission of oral testimony before welfare benefits could be terminated. *Mathews* explained:

---

[12] The administrative procedure in *Mathews* granted disability candidates the right to a full evidentiary hearing post-termination of disability benefits. 424 U.S. at 339. Eldridge's claim was that due process required an evidentiary hearing before the government terminated benefits even where there was a right to a post-deprivation evidentiary hearing. The framework also allowed for retroactive benefits in cases where the disability recipient proved continuing eligibility for benefits at the evidentiary hearing or at any later stage in the review proceedings. *Id.* If Oshodi is removed, he will have no further opportunity to challenge the IJ's determination.

> Central to the evaluation of any administrative process is the nature of the relevant inquiry. . . . In the [welfare cases], a wide variety of information may be deemed relevant, and issues of witness credibility and veracity often are critical to the decisionmaking process. *Goldberg* noted that in such circumstances "written submissions are a wholly unsatisfactory basis for decision."

*Mathews*, 424 U.S. at 343–44 (quoting *Goldberg*, 397 U.S. at 269). Therefore, *Mathews* teaches us that cases that hinge on credibility are precisely the types of cases where the probable value of oral testimony is high and the lack of oral testimony significantly raises the risk of an erroneous decision.[13] Therefore, the second *Mathews* factor weighs in favor of requiring oral testimony in asylum cases, which often turn solely on credibility determinations.[14]

---

[13] The dissent cites to *Mackey v. Montrym*, 443 U.S. 1 (1979) to suggest that this is "a lesson the Supreme Court has not yet learned." Dissent at 43. But *Mackey* was a case about whether a state was required to provide for a pre-deprivation hearing before suspending an individual's driver's license. The statutory scheme gave the individual the right to a full evidentiary hearing post-deprivation. Thus, it does not at all address whether an individual has a right to live testimony in cases involving credibility determinations. Indeed, the Court recognized that an evidentiary hearing, although post-deprivation, would be the "necessary" place to "resolve questions of credibility or conflicts in the evidence." *Id.* at 15.

[14] The dissent argues that, in determining credibility, "the ability to present live direct testimony during a removal proceeding strikes [the dissent] as relatively unimportant," and bases the second factor analysis on that proposition. Dissent at 45. Although it may strike the dissent as

The final *Mathews* factor requires us to consider the burdens our holding may place on the administrative process. The burden here is minimal since we only require that IJs follow the governing rules and regulations. As discussed above, *Matter of Fefe* requires testimony by an asylum applicant in each case and requires "the full examination of an applicant" except in the exceptional case where the parties stipulate that "the applicant's testimony would be entirely consistent with the written materials and that the oral statement would be believably presented." 20 I. & N. Dec. at 118. In short, we require no process that the government has not already imposed on itself.

In sum, we conclude that a *Mathews* analysis clearly supports our conclusion that due process entails the right to present oral testimony in asylum and withholding cases that turn upon an applicant's credibility.

---

relatively unimportant, the importance of live testimony is well-established in Supreme Court and Ninth Circuit jurisprudence, *supra* 18–20, 26–27. Indeed, we accord IJs significant deference based, at least in part, upon the assumption that the ability to observe live testimony matters a great deal, *supra* 18–19.

The dissent also cites *Apouviepseakoda v. Gonzales*, 475 F.3d 881, 897 (7th Cir. 2007) (Posner, J., dissenting), wherein Judge Posner, in dissent, questioned the value of live testimony to credibility determinations where such testimony is presented through an interpreter. Dissent at 46. Judge Posner's views, regardless of their merit, are not relevant here where there was no interpreter. We doubt that Judge Posner's critique applies not only to those who testify through interpreters but also to those who "simply grew up in a different culture." Dissent at 46–47. The possible cultural obstacles the dissent cites are not an excuse for depriving petitioners the right to present their own story in their own words. Because Oshodi testified in English, and not through an interpreter, the views of Judge Posner, as echoed by the dissent, are of no import here.

## C.

To prevail on his due process claim, Oshodi must also show prejudice. *Colmenar*, 210 F.3d at 971. To show prejudice Oshodi need only demonstrate "that the outcome of the proceeding *may have been affected* by the alleged violation." *Zolotukhin*, 417 F.3d at 1076 (emphasis in original) (quoting *Lopez-Umanzor*, 405 F.3d at 1058). Here, the outcome turned entirely on Oshodi's credibility. The IJ recognized that Oshodi's application, if believed, demonstrated past persecution. Given the importance of an applicant's live testimony to an IJ's credibility determination, *supra*, it follows that the IJ's failure to allow Oshodi to testify about the persecution he described in his application may have influenced his adverse credibility decision. Oshodi's "testimony could have been so compelling and consistent that it would have altered the judge's initial credibility determination." *Kerciku*, 314 F.3d at 919.

A finding of prejudice is further supported by a close examination of the IJ's decision in this case. The IJ's decision relied heavily on Oshodi's testimony and gave little to no credence to the contents of his declaration. He dedicates three full pages to outlining all of Oshodi's testimony, which primarily consisted of the government's cross-examination. With respect to the two primary events of past persecution at the foundation of Oshodi's claim, the IJ devoted one paragraph. Moreover, the IJ appears to have minimized the importance of these events to Oshodi's claim *because* he testified to them only briefly: "The respondent testified briefly about two other incidents that involved persecution by Nigerian officials." Of course, the reason Oshodi only testified briefly about these events was that the IJ instructed him not to testify about them at all. The IJ also

incorrectly discredited these events because "[t]he respondent failed to include these incidents on his application for asylum, but submitted into evidence a separate affidavit describing each in some detail." In fact, Oshodi *did* mention both of these events with some specificity in his application and then refers the reader to an attached declaration discussing the events in even greater detail. Because the IJ cut off Oshodi's testimony early in the hearing, the only evidence of the significant events of past persecution was in his application and attached declaration. The IJ, however, gave that evidence little weight, focusing instead on the content of Oshodi's limited testimony. On this record, Oshodi has clearly met his burden to demonstrate that his inability to fully testify may have affected the outcome of his case. *See Zolotukhin*, 417 F.3d at 1076.[15]

---

[15] The dissent merely repeats the IJ's credibility determination and then concludes that Oshodi cannot prevail under the prejudice prong because the IJ's credibility determination was, the dissent believes, well-supported. Because the IJ will have to conduct a new hearing, we do not reach the merits of the credibility finding. We note, however, that the credibility determination is not as ironclad as the dissent suggests. We observe that the credibility finding was based exclusively on the purported inconsistencies in Oshodi's testimony and gave no weight to significant corroborating evidence that went to the heart of his claim, in particular a newspaper article discussing Oshodi and a medical report describing fourteen separate scars or chronic conditions he suffers from that are consistent with his story. Instead, the IJ found a lack of credibility without considering that evidence and then discounted the evidence because of the credibility finding. On remand, the IJ must consider the totality of the circumstances, including the "consistency of [Oshodi's] statements with other evidence of record" when determining credibility. 8 U.S.C. § 1158(b)(1)(B)(iii). As we have explained, "an IJ cannot selectively examine evidence in determining credibility, but must present a reasoned analysis of the evidence as a whole." *Shrestha v. Holder*, 590 F.3d 1034, 1040 (9th Cir. 2009).

## CONCLUSION

As we stated in *Colmenar*, "[w]e do not enjoy second-guessing the way Immigration Judges run their courtrooms," but it is imperative that asylum and withholding claims are heard "fully and fairly" before we make a judgment on the merits. 210 F.3d at 973. "This is consistent with our role as judges, and the values of our Constitution demand no less." *Id.* We reaffirm our holding, and the BIA's own rule, that an applicant's oral testimony is "an essential aspect of the asylum adjudication process" and the refusal to hear that testimony is a violation of due process. *Matter of Fefe*, 20 I. & N. Dec. at 118; *see also Colmenar*, 210 F.3d at 972. The petition for review is granted and the case is remanded for a new hearing before an IJ.

**PETITION GRANTED in part and REMANDED.**

KOZINSKI, Chief Judge, joined by RAWLINSON and BYBEE, Circuit Judges, dissenting:

The majority today holds that aliens seeking asylum have a constitutional right "to testify fully as to the merits of their application." Maj. op. 16. But constitutional rights, once created, are not easily cabined: If would-be immigrants have a right to testify without limitation in support of their claims,

---

Unlike the dissent, we do not presume to decide that an IJ, once noting some inconsistencies in the record, could not still find an applicant credible based on persuasive testimony. It is not inconceivable that a man with a criminal background could also face severe persecution in his home country.

so do untold millions of citizens whose vital interests are at stake in administrative proceedings. Which is doubtless why the Supreme Court has rejected the existence of any such right. Today's ruling is, in any event, wholly unnecessary because the IJ in this case didn't preclude petitioner from testifying. The majority manufactures this constitutional melodrama out of whole cloth.

Oshodi submitted copious written materials in support of his asylum application, including medical reports, letters from family and a declaration describing brutal encounters with Nigerian police. At an oral hearing, he called an expert witness, testified under the direction of his lawyer and had a chance to explain adverse evidence offered by the government. The IJ didn't believe him and explained why: Oshodi's long history of lying about his identity and the numerous inconsistencies in his testimony. *See* Appendix. This careful and detailed credibility finding is solid as a rock; we have absolutely no business reversing it.

**1.** First things first: The IJ didn't preclude Oshodi from testifying. The majority focuses on a fleeting exchange that took place shortly after Oshodi began his direct examination. Oshodi opened with biographical details, such as his education in Nigeria and his involvement in politics as a student. Impatient that Oshodi's lawyer was lingering over background material, the IJ encouraged him to cut to the chase:

> I've read the statements of the respondent, read his application. I've gone over the materials. I'm not looking for everything to simply be repeated. I mean I understand that there needs to be testimony concerning [the]

application, but if you have something to add to what was there, fine; otherwise, I don't need it line by line, okay?

Based on this and nothing more, the majority claims that the judge "cut off the direct examination" and "refus[ed] to hear Oshodi's full testimony with respect to the abuses he suffered in Nigeria." Maj. op. 8, 16. The majority intones this mantra at least twenty-five times, as if repeating the accusation will make it stick. Maj. op. 4, 5, 7, 8, 9, 11, 13, 14, 15, 16, 17, 20, 21, 22, 28, 29. But if immigration judges (and other judges too, presumably) are constitutionally prohibited from uttering even such tame exhortations, then trials and hearings will become Wagnerian operas where every litigant can hold center stage until the cows come home.

Judicial time and attention are limited, and feedback about what's going on in the judicial mind is helpful. The IJ's statement was no different from what we say to counsel hundreds of times every year: "We've read the briefs, so there's no need to recite the facts," or "We understand your position on the suppression argument, and we'd like you to focus on the jury instructions instead." Judges are not potted plants. Giving litigants the kind of guidance that the IJ gave here is an important part of the job, not a denial of due process.

The majority insists that the IJ "barred complete chunks of . . . oral testimony," maj. op. 16 (brackets omitted), but it can't cite any prohibitory words. The judge didn't say, "Mr. Oshodi, you may not testify as to anything already addressed in your papers." He didn't say, "Testimony will be limited to new material." Nor did he use the majority's word, "barred,"

or any of its cognates, synonyms or equivalents.  Rather, the IJ (1) recognized "that there needs to be testimony concerning [the] application," but advised Oshodi that (2) he was not "looking for everything to simply be repeated" and that (3) Oshodi was free to add new material.  Then he added, (4) "[O]therwise, I don't need it line by line, okay?"  If the judge meant to prohibit repetition of anything in the written application, he would have said so outright or stopped at statement (3).  The last phrase makes sense *only* if the judge expected Oshodi to testify as to material that was already covered in his asylum application.

The IJ's mild intervention echoed exhortations heard in courtrooms across the country every day:  "Move it along, counselor."  If admonitions this mild and innocuous are due process violations, then what *can* a judge say to a meandering litigant to keep the hearing on track?  According to the majority, judges violate the Constitution if they issue any instruction that a litigant or his lawyer might interpret as a refusal to hear testimony.  But in a system with a backlog of nearly 30,000 unresolved cases from last year alone, *see* U.S. Dep't of Justice, Exec. Office for Immigration Review, *FY 2012 Statistical Year Book* B2 (2013), we can't afford to turn every sign of impatience into a constitutional violation, *see Aguilar-Solis* v. *INS*, 168 F.3d 565, 569 (1st Cir. 1999).

IJs commonly rush aliens through their testimony far more forcefully than the judge did here, *see, e.g.*, *Boci* v. *Gonzales*, 473 F.3d 762, 765 (7th Cir. 2007), and lawyers have a professional duty to push back if they believe their clients' rights are being compromised, *see* Nat'l Immigration Project, Nat'l Lawyers Guild, *Immigration Law and Defense* § 13.72, at 974 (2012). Nothing the IJ said precluded Oshodi from giving a vivid oral account of the incidents of

persecution he allegedly suffered. If his lawyer had any doubts on that score, he could have asked for clarification or made a proffer as to what his client would say. At the very least, he should have objected.

Oshodi's lawyer chose not to pursue the matter. For all we know, he made a tactical decision, fearing that Oshodi would confuse facts or testify inconsistently with his written statement. *See Grava* v. *INS*, 205 F.3d 1177, 1180 (9th Cir. 2000) ("Given the difficulties many applicants face at their hearings . . . the asylum application sometimes represents an alien's best case."). Clients do stumble on occasion, particularly when they're spinning tales, and Oshodi has a long history of prevarication. His lawyer may have been just as happy to rest on the written submissions.

The majority points to a second instance where the IJ allegedly kept Oshodi from testifying, maj. op. 9–10, but this is pure fantasy. Oshodi's lawyer asked him to recount an incident where he was beaten by police at a political rally. Rather than answer the question, Oshodi spoke at length about his door-to-door campaign to raise awareness about a tainted election. Understandably confused, the IJ tried to get Oshodi back on track. The majority claims that the IJ precluded Oshodi from responding, but this just isn't true. Here is the full exchange:

> **Q:** Briefly describe what happened in this encounter with the police.
>
> **A:** Like I said earlier, we were in the neighborhood called Oshodi, if you can remember, is my last name and is the (indiscernible) of Nigeria. And we were

talking to people in the neighborhood sharing political awareness to the people through political material such as posters, flyers, and pamphlets, and we talked to you know, advised people of what was going wrong in Nigeria.  Specifically, in 1979 when Shagari won the election,

**IJ:** Spelling please?

**A:** S H A G A R I.  There was, there was an electoral committee that was elected to oversee and write a little portion of the constitution, and there was a decree which specifies that any president from any party must win two-thirds of the votes or could not be elected as a president and the election has to be done over.  Unfortunately, this present president, Alhaji Shehu Shagari, only won 12 states and 25% and the 13 states, he only won like 10% of that, which was an illegal election.  So my main strategy was to alert the people of Nigeria, especially my community and the chapter to oppose the election.  Also in Nigeria, the people—

**IJ:** Excuse me.  Counsel, do you have a specific question for the respondent to answer because right now I don't know what he's answering.  I don't think that it was the last question?

Oshodi spent a page of transcript (six fairly convoluted sentences) not answering the question put to him.  The IJ

pointed this out and asked his lawyer whether he had a "specific question for [Oshodi] to answer." Rather than restating his question as the IJ suggested, the lawyer passed on to another matter and then abruptly ended his examination. The majority is being unjust in calling what the IJ did an "admonishment" and blaming him for the lawyer's decision to end the examination. Maj. op. 9–10.

We have long held that judges act well within their discretion when they "participate in the examination of witnesses for the purpose of clarifying the evidence." *United States* v. *Mostella*, 802 F.2d 358, 361 (9th Cir. 1986). IJs have not merely the inherent authority of trial judges, but an affirmative duty, imposed by statute, to develop a clear record for appeal. *See* 8 U.S.C. § 1229a(b)(1); *Kaur* v. *Ashcroft*, 388 F.3d 734, 737 (9th Cir. 2004); 8 C.F.R. § 1240.11(c)(3)(ii). Oshodi had strayed far from his lawyer's question, and the IJ tried to bring clarity and coherence to a potentially confusing portion of the transcript. That Oshodi's lawyer then suddenly ceased questioning Oshodi cannot fairly be attributed to anything the IJ said or did.

The majority's reading of the record "is yet another tiresome example of the nitpicking we engage in as part of a systematic effort to dismantle the reasons immigration judges give for their decisions." *Kumar* v. *Gonzales*, 444 F.3d 1043, 1056 (9th Cir. 2006) (Kozinski, J., dissenting in part) (internal quotation marks omitted). Here the IJ was thoroughly familiar with Oshodi's written submissions, and wished to focus the hearing on new, important or disputed material. *See* 8 C.F.R. § 1240.11(c)(3). Instead of praising the IJ's diligent preparation and careful management of the hearing, the majority chastises him for violating the Constitution. But "an IJ who plays an active role in keeping

the focus of the evidentiary hearing sharp is to be commended, not condemned." *Jorgji* v. *Mukasey*, 514 F.3d 53, 59 (1st Cir. 2008) (internal quotation marks omitted).

**2.** But let's assume that the IJ did what the majority unfairly claims he did. Let's pretend he told petitioner: "You may not testify as to anything contained in your sworn asylum statement. You may testify as to any new material, and you may then be cross-examined as to your written and oral statements." Had the IJ done this, which plainly he did not, this would present an interesting constitutional question: Does due process guarantee an illegal alien seeking to remain in the United States the right to present live testimony in support of his petition, or may he be limited to a sworn written statement followed by live cross-examination?

The Supreme Court has spoken directly to this issue: "There is no inexorable requirement that oral testimony must be heard in every administrative proceeding in which it is tendered." *FDIC* v. *Mallen*, 486 U.S. 230, 247–48 (1988). Mallen was the president and a director of a federally insured bank who was indicted, but not yet tried, on various false statement charges. *Id.* at 236–37. The FDIC issued an ex parte order suspending Mallen from further participation in the bank's affairs. *Id.* at 238. Mallen requested an administrative hearing where he proposed to present "both oral testimony and written evidence" showing that his "continued service was not likely to pose a threat to the interests of the bank's depositors or to threaten public confidence in the bank." *Id.* The FDIC agreed to a hearing, but "took the position that oral testimony would not be necessary." *Id.* at 239. The FDIC relied on 12 U.S.C. § 1818(g)(3), which provided that the bank officer could "submit written materials (or, at the discretion of the agency,

oral testimony) and oral argument." *Mallen*, 486 U.S. at 235–36 n.6.

Mallen filed suit in district court, claiming that he was denied due process because the administrative hearing did not guarantee him the right to present live testimony. *Id.* at 239. The district court rejected the first claim but sustained the second, holding the statutory procedure "'constitutionally inadequate . . . because it fails to provide for a hearing at which oral evidence can be presented.'" *Id.* (quoting 667 F. Supp. 652, 659–60 (N.D. Iowa 1987)). On that basis, it nullified Mallen's suspension. *Id.* The government took a direct appeal to the Supreme Court under then-prevailing procedures.

The Supreme Court unanimously reversed. *Id.* at 248. It recognized that Mallen's "interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause," and Mallen was therefore "entitled to the protection of due process of law." *Id.* at 240. The Court rejected his contention that the statutory procedure "violates due process because it does not guarantee an opportunity to present oral testimony." *Id.* at 247. The Court recognized that there may be "post-suspension proceedings under § 1818(g) in which oral testimony is essential to enable the hearing officer to make a fair appraisal of the impact of a suspended officer's continued service on the bank's security and reputation." *Id.* Mallen, however, had not proffered any such evidence to the hearing officer and given him an opportunity to accept or reject it. "For all we know," the Court explained, "the hearing officer might have accepted such evidence; *or if he rejected it, he might have been entirely correct in deciding that it was merely cumulative to material*

*that was adequately covered by written submissions or that it was otherwise unnecessary or improper*." *Id.* (emphasis added).   In reaching its conclusion, the Court cited with approval the three-judge district court's ruling in *Feinberg* v. *FDIC*, 420 F. Supp. 109, 120 (D.D.C. 1976), which held that such a hearing "does not seem to require any more than written submission." *Mallen*, 486 U.S. at 248 n.13.

*Mallen* stands for two propositions that bear directly on our case.   First, it holds squarely that due process does not require an opportunity to present live testimony in every case where important property or liberty interests are at stake.   At times, *all* oral testimony can be excluded, not merely direct testimony, as the majority (wrongly) posits happened in Oshodi's case.   Second, the Court states quite clearly that one legitimate basis for precluding the presentation of oral testimony is that the "material . . . was adequately covered by [the] written submissions." *Id.* at 247.   If the IJ prohibited anything at all here, it was precisely what the Supreme Court in *Mallen* said it was OK to prohibit.

*Mallen* is not the only case where the Supreme Court has shown itself reluctant to impose constitutional constraints on administrative proceedings.   In *Richardson* v. *Perales*, 402 U.S. 389 (1971), the Court considered whether a hearing officer violated due process by basing the denial of disability benefits on the hearsay reports of nonattending physicians, when those reports were contradicted by the live testimony of a treating physician. *Id.* at 401–02. The district court had been "reluctant to accept as substantial evidence the opinions of medical experts submitted in the form of unsworn written reports, the admission of which would have the effect of denying the opposition an opportunity for cross-examination," and the Fifth Circuit affirmed. *Id.* at 397–98.

The Supreme Court reversed, emphasizing the informality of Social Security claims procedures and the burden and expense of conducting 20,000 hearings a year. *Id.* at 400–06.

The majority purports to read *Mallen* as "also stan[ding] for the proposition that, in some cases, due process likely requires the admission of oral testimony." Maj. op. at 24 (citing *Mallen*, 486 U.S. at 247). *Mallen* presents this as an assumption, not a holding, but dismisses it as inapplicable when the oral testimony is "merely cumulative to material that was adequately covered by written submissions," 486 U.S. at 247—precisely Oshodi's situation. Even under the majority's own reading of *Mallen*, there is no due process violation here.

But the majority far outstrips even its own optimistic interpretation of *Mallen* by holding that IJs must allow oral testimony not just in *some* asylum cases, but in *all* of them: "[O]ur holding today [is] that due process requires the admission of oral testimony in an asylum and withholding hearing wherein the applicant's eligibility for relief turns on his credibility." Maj. op. at 24–25. Asylum and withholding cases inherently turn on credibility because the petitioner must persuade the IJ that he will be subject to persecution if he returns to his home country. Oshodi's case is, in fact, typical: He alleges incidents of persecution and violence directed against him and his family in a distant land, maj. op. 5–7, and seeks to avoid deportation to a country riven by strife, *id.* at 6, 7. My colleagues and I have seen similar claims in countless cases that litter the pages of the Federal Reporter and, even more, the Federal Appendix. *See, e.g.*, *Mendoza-Pablo* v. *Holder*, 667 F.3d 1308, 1314–15 (9th Cir. 2012); *Li* v. *Holder*, 559 F.3d 1096, 1110–12 (9th Cir. 2009); *Akinshina* v. *Gonzales*, 161 Fed. App'x 694 (9th Cir. 2006);

*David* v. *Gonzales*, 159 Fed. App'x 754 (2005); *Mashiri* v. *Ashcroft*, 383 F.3d 1112, 1119–21 (9th Cir. 2004). The majority opinion here directly contravenes the Supreme Court's holdings in *Mallen* and *Perales*.

Nor can this holding be confined to the immigration context. The majority holds that the Constitution gives would-be immigrants a right to unfettered oral testimony. There's no credible way we can deny that right to American citizens in the multitude of other administrative contexts that involve credibility. Starting today, anyone in the Ninth Circuit involved in "any contested administrative hearing"— from the Social Security disability claimant to the unemployment benefits seeker to the zoning applicant—has a right to present full oral testimony without impediment so long as "credibility is a determinative factor." Maj. op. 13.

By injecting due process where the Supreme Court has said it doesn't belong, the majority provides a blueprint for the imposition of trial-like procedures on a wide swath of administrative proceedings. All of this disregards the Supreme Court's steadfast refusal to hold that the procedural protections that attend a trial are necessary to ensure fundamental fairness in administrative hearings. *See, e.g.*, *Memphis Light, Gas & Water Div.* v. *Craft*, 436 U.S. 1, 18–19 (1978); *Bd. of Curators of the Univ. of Mo.* v. *Horowitz*, 435 U.S. 78, 84–86 (1978).

The Supreme Court first announced that an alien facing removal is entitled to an "opportunity to be heard upon the questions involving his right to be and remain in the United States" in *The Japanese Immigrant Case*, 189 U.S. 86, 101 (1903). What kind of hearing did the Supreme Court have in mind? "[N]ot necessarily an opportunity upon a regular, set

occasion, and according to the forms of judicial procedure, but one that will secure the prompt, vigorous action contemplated by Congress, and at the same time be appropriate to the nature of the case upon which such officers are required to act." *Id.* As far back as 1903, then, the Court made clear that due process in this context can be satisfied with something far less formal than a hearing that conforms "to the forms of judicial procedure."

To determine whether a particular procedure is constitutionally required in removal proceedings, we must balance the various interests at stake. *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976); *see also Landon* v. *Plasencia*, 459 U.S. 21, 34–35 (1982). The majority begins its balancing in a curious way: by telling us that it's meaningless because we've already found there's a constitutional right to present oral testimony in removal proceedings. The case that supposedly established this right, *Colmenar* v. *INS*, 210 F.3d 967 (9th Cir. 2000), found a denial of due process when the IJ announced that he'd made up his mind before the hearing began, "behaved . . . as a partisan adjudicator seeking to intimidate," and refused to allow the petitioner to testify to clearly relevant matters not covered in his written application. *Id.* at 971. So *Colmenar* has little in common with our case and, in any event, didn't engage in a *Mathews* balancing. It rested instead on a single BIA case that had nothing to do with due process. *Id.* at 971–72 (discussing *Matter of Fefe*, 20 I. & N. Dec. 116, 118 (BIA 1989)).

Having already figured out the right answer, my colleagues grudgingly go about showing their work. Under *Mathews*, we must balance (1) the private interest at stake; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of

additional . . . safeguards"; and (3) the government's interest, which includes the burdens imposed by more process. *Mathews*, 424 U.S. at 335. I'm willing to indulge the majority's assumption that the first factor weighs in favor of the immigrant, although I rather suspect that many asylum applicants and their lawyers would dearly love to have an excuse to avoid testifying without creating an adverse inference. But the majority's perfunctory examination of the benefit of additional procedural safeguards and the burden those procedures will impose falls far short of the rigorous analysis we must conduct when determining constitutional rights.

**Sufficiency of existing procedures.** The existing procedures give the alien substantial protections. The alien first submits a written application for withholding of removal, and then gets a hearing at which he has the right to present evidence; call his own witnesses; and cross-examine adverse witnesses. *See* 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. §§ 1240.10(a)(4), 1240.11(c)(3)(iii). Should he require documents not readily available to him, he may apply to the immigration judge for a subpoena. *See* 8 C.F.R. § 1003.35(b)(1). He has the privilege of being represented by counsel. *See* 8 U.S.C. § 1229a(b)(4)(A). After the hearing, the alien may be permitted to submit additional briefing to supplement his file. *See Somakoko* v. *Gonzales*, 399 F.3d 882, 883 (8th Cir. 2005).

The majority argues that full oral testimony is necessary because "*Mathews* teaches us" it's required in "cases that hinge on credibility." Maj. op. 26. If so, it's a lesson the Supreme Court has not yet learned. *See, e.g.*, *Mackey* v. *Montrym*, 443 U.S. 1, 24 (1979) (Stewart, J., dissenting) (decrying majority's decision not to require a hearing where

issues "plainly involve[d] . . . credibility and veracity"). Live testimony simply isn't a constitutional prerequisite to making a credibility determination in an administrative proceeding.

In an effort to prove otherwise, the majority cherry-picks language from a handful of criminal cases. Maj. op. 18. But the cases themselves merely recognize the value of oral testimony in certain narrow contexts. *See, e.g.*, *United States* v. *Thoms*, 684 F.3d 893, 903 (9th Cir. 2012) ("[A] district court abuses its discretion when it reverses a magistrate judge's credibility determinations, made after receiving live testimony and favorable to the government, without viewing key demeanor evidence, with one exception . . . ."). Equally unpersuasive is the majority's assertion that *Anderson* v. *Bessemer City*, 470 U.S. 564 (1985) stands for the proposition that special deference is owed a trial court's credibility determinations because it is best able to evaluate demeanor during live testimony. Maj. op. 19. *Anderson*, in fact, stands for the contrary proposition: We apply the same deferential standard "even when the district court's findings do not rest on credibility determinations" because the "rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility." *Anderson*, 470 U.S. at 574.

My colleagues are so busy stringing together out-of-context quotes that they overlook that the IJ has other reliable means of assessing credibility. For one, the alien may introduce written evidence to corroborate his declaration, including news accounts, reports from doctors and letters from family and friends. *See* 8 U.S.C. § 1229a(b)(4)(B). The regulations also require the IJ to place the alien under oath and question him about the truth of his application. 8 C.F.R. § 1240.11(c)(3)(iii). We have long recognized that cross-

examination, by both the immigration judge and the government's lawyer, is a powerful engine for detecting the truth of an alien's testimony. Indeed, cross-examination is far more important than direct examination. Most people can tell a convincing tale under friendly questioning by their own lawyers, but surviving a stringent cross-examination is what *really* matters in establishing credibility. *See Singh-Kaur* v. *INS*, 183 F.3d 1147, 1151 (9th Cir. 1999); *see also Abovian* v. *INS*, 257 F.3d 971, 977 (9th Cir. 2001) (Kozinski, J., dissental). The statutory right to submit records, coupled with some oral colloquy between the alien and the IJ, guarantees the alien a reasonable opportunity to present evidence bearing on his credibility.

Given the multitude of tools available for the petitioner to establish his credibility and prove up his story, the ability to present live direct testimony during a removal proceeding strikes me as relatively unimportant. Judge Friendly, in his seminal article cited approvingly by the Supreme Court in *Mathews*, spoke directly to this issue:

> I would object to requiring oral presentation as a universal rule. Determination whether or not an oral hearing is required should depend on the susceptibility of the particular subject matter to written presentation, on the ability of the complainant to understand the case against him and to present his arguments effectively in written form, and on the administrative costs.

Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1281 (1975).

Judge Posner, who is no fan of immigration judges, has noted the insignificance of oral testimony in immigration cases:

> The fact that [petitioner] was testifying through an interpreter has a significance that my colleagues do not appreciate when they say that "The IJ spent 6 hours in a hearing room, face to face, with [petitioner]. We have never met her." I take this to be an allusion to the common though not necessarily correct belief that being present when a witness testifies greatly assists a judge or juror in determining whether the witness is telling the truth. Even if so in general, it cannot be so when the witness is a foreigner testifying through an interpreter, especially if the judge cannot even hear the foreigner, but only the interpreter. Reading the facial expressions or body language of a foreigner for signs of lying is not a skill that either we or [the IJ] possess.

*Apouviepseakoda* v. *Gonzales*, 475 F.3d 881, 897 (7th Cir. 2007) (Posner, J., dissenting).

Whether seeing a witness testify live is critical to judging his credibility is, as Judge Posner says, debatable. The pre-eminent civil procedure treatise suggests that "[p]erhaps . . . the entire American reliance on demeanor is misplaced." 12 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3070.2 (2d ed. 1997); *see also Morales* v. *Artuz*, 281 F.3d 55, 61 & nn.3–4 (2d Cir. 2002) (noting empirical studies have refuted belief that "demeanor is a useful basis for assessing credibility"). Observing a witness

who communicates through the cumbersome intermediation of an interpreter, or even simply grew up in a different culture, can be downright misleading.  *See Li*, 559 F.3d at 1100 n.4 (9th Cir. 2009) (attributing seeming inconsistencies in an alien's testimony to "numerous translation difficulties"); *Kadia* v. *Gonzales*, 501 F.3d 817, 819 (7th Cir. 2007) (Posner, J.) (noting that "immigration judges often lack the 'cultural competence' to base credibility determinations on an immigrant's demeanor"); *Dia* v. *Ashcroft*, 353 F.3d 228, 276 (3d Cir. 2003) (en banc) (McKee, J., dissenting in part) ("[W]hile the failure to look someone in the eye while speaking is usually interpreted as an indication of deception by people in Western cultures, avoiding eye contact has a very different meaning in some other cultures."); *Chouchkov* v. *INS*, 220 F.3d 1077, 1083 n.15 (9th Cir. 2000) ("[W]hat sounds peculiar in one country may be the norm in another."); *Barapind* v. *Rogers*, No. 96-55541, 1997 WL 267881, at *2 (9th Cir. Feb. 6, 1997) (holding IJ's belief that petitioner's "stoic" demeanor indicated dishonesty was the result of cultural bias).  In light of the other mechanisms available to the IJ for detecting whether the petitioner is telling the truth or lying, I can't say that allowing a petitioner to drone on endlessly, restating every word and every line of his asylum application, is particularly significant to affording him a fair opportunity to present his case.

**Burdens imposed by additional procedures.**    Here again my colleagues disregard what *Mathews* requires: a full balancing of all of the interests at stake.  Instead, the majority asserts the burden on the government is "minimal" because it is merely being ordered to follow "the governing rules and regulations."   Maj. op. 27.   What "governing rules and regulations"?  The majority cites none.  It does cite *Matter of Fefe*, but that case doesn't purport to give asylum applicants

an unfettered right to testify. *See* 20 I. & N. Dec. at 118. In *Fefe*, the BIA "anticipate[d]" a thorough examination of applicants in most cases, but established no right to present testimony in every case. *Id.*

Had the majority given more than cursory attention to this factor, it would have noted that immigration judges decided an average of 1,014 cases each in 2008, a pace that would make any judge's head spin. *See* Improving Efficiency and Ensuring Justice in the Immigration Court System: Hr'g Before the S. Comm. on the Judiciary, 112th Cong. 3 (2011) (statement of Karen T. Grisez, Am. Bar Ass'n Comm'n on Immigration). "To produce these numbers, each judge must have issued an average of at least 19 decisions each week, or approximately four decisions per weekday, . . . even while assuming no absences for vacation, illness, training, or conference participation." *Id.*

Let's say that the IJ here had decided to manage his Sisyphean caseload by instructing aliens that they could not repeat anything already in their written submissions, but could testify on direct only as to new material, before undergoing cross-examination. Or let's say that the Attorney General by regulation provided that aliens must submit all of their evidence in writing, and must appear at an oral hearing only to be cross-examined as to the details of their stories. What then?

The Supreme Court has told us that we cannot judge the propriety of any such procedure in the abstract, but must consider the costs and burdens imposed on the system if the IJ is *not* permitted to follow these streamlined procedures: "[T]he Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a

factor that must be weighed." *Mathews*, 424 U.S. at 348. Giving IJs discretion to preclude direct testimony would significantly shorten the time devoted to each hearing and, in the aggregate, considerably speed up the process of adjudicating petitions for immigration relief. It's easy for us to say, "Let them hire more IJs," but in this era of cutbacks and sequestrations, when U.S. citizens are feeling the consequences of dwindling federal resources, the government will not ramp up the budget for helping undocumented aliens gain a legal foothold in the United States.

The majority ignores these considerations and merrily piles on more process, but it's aliens with meritorious claims who will suffer for it. Applicants for asylum and similar relief wait an average of 550 days for a decision from the immigration court, 660 if they're in California. *See* Suzy Khimm, *Many Immigrants Facing Deportation Must Wait 550 Days For Their Day In Court*, WashingtonPost.com (Feb. 22, 2013). These delays are a boon to aliens who make flimsy claims in an effort to forestall their inevitable removal, but they hurt aliens scarred by persecution whose lives are on hold as they wait to secure a future in the United States. While overstating the virtues of oral testimony, my colleagues forget that prompt adjudication of claims is a component of fundamental fairness. *See* 2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.10, at 894 (5th ed. 2010).

**3.** Even if due process required that an alien be allowed to "testify fully," as the majority wrongly holds, Oshodi can't prevail unless he was prejudiced by being denied this right. *Cinapian* v. *Holder*, 567 F.3d 1067, 1074 (9th Cir. 2009). The majority recites our circuit's questionable prejudice test, which allows aliens to meet their burdens by demonstrating that "the outcome of the proceeding *may have been affected*"

by the due process violation. *Zolotukhin* v. *Gonzales*, 417 F.3d 1073, 1076 (9th Cir. 2005). That's right: Around here, an alien can demonstrate prejudice by showing a mere *possibility* that the error influenced the result. This is no standard at all. One can seldom say with confidence that a little more testimony would *not* have affected the outcome. *See id.* at 1077.

In our circuit, aliens in removal proceedings have an easier time showing prejudice than do criminal defendants, who must demonstrate at least "a reasonable possibility" that the constitutional errors at their trial contributed to their conviction, *see Chapman* v. *California*, 386 U.S. 18, 23 (1967), and a much easier time than habeas petitioners facing execution, who must show such errors had a "substantial and injurious effect" on the verdict, *see Brecht* v. *Abrahamson*, 507 U.S. 619, 637 (1993). We have it exactly backwards: Citizens facing loss of life or liberty and the stigma of a criminal conviction should get greater procedural protection than foreign nationals seeking to escape deportation from the United States.

Not surprisingly, our prejudice standard is an outlier among the circuits, most of which require a substantial probability that the alleged due process violation swayed the outcome of the removal proceeding. *See Denis* v. *Att'y Gen. of the United States*, 633 F.3d 201, 219 (3rd Cir. 2011) ("substantial prejudice"); *Zhou Zheng* v. *Holder*, 570 F.3d 438, 442 (1st Cir. 2009) ("likely to have affected the outcome of the proceedings"); *Lin* v. *Holder*, 565 F.3d 971, 979 (6th Cir. 2009) ("substantial prejudice"); *Avila* v. *U.S. Att'y Gen.*, 560 F.3d 1281, 1285 (11th Cir. 2009) ("would have affected the outcome of the case"). As we are sitting en banc, we

should overrule *Zolotukhin* and bring our standard into line with the majority view.

But Oshodi loses even under our watered-down prejudice standard. The majority speculates that the immigration judge might have found Oshodi credible had he been permitted to testify about the "brutal torture" he suffered in Nigeria. Maj. op. 13. This makes no sense at all. Why would testifying about torture be more believable than testifying about anything else? Oshodi's testimony was riddled with evasions and inconsistencies, and he had a long record of dishonesty. Additional testimony could do nothing to cure the problems the IJ correctly perceived in the testimony Oshodi had already delivered.

Oshodi claimed to have entered the United States on a business visa, then admitted to entering illegally for a little while before rehashing the story about the business visa once again. He told an immigration officer that he feared persecution in Nigeria because of his "dad's" political advocacy, but then maintained on cross that it was his "grandad's" activism that placed him in danger. He claimed to own significant land in Nigeria, then conceded it was not in his name. Oshodi's brother was sitting in the courtroom, yet, as the IJ noted, Oshodi didn't ask him to corroborate any of these contested details about his family or personal history. Additionally, Oshodi acknowledged his arrests for passing bad checks, giving false information to a police officer and killing a woman in a drunk driving accident. The IJ was especially troubled that Oshodi was convicted for this last offense under a false name, one of several that he employed, allegedly to avoid detection by Nigerian spies monitoring his whereabouts in the United States. The IJ also pointed to

numerous other discrepancies and evasions in Oshodi's testimony.

The majority sniffs that these inconsistencies concern "peripheral issues," but my colleagues are stuck in a pre-REAL ID Act time warp. The Act permits IJs to assess credibility based on any inconsistency or falsehood, regardless of whether it "goes to the heart of the applicant's claim." *See* 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1231(b)(3)(C); *see also Shrestha* v. *Holder*, 590 F.3d 1034, 1043 (9th Cir. 2010). The logic behind the statute is the same that animates Federal Rule of Evidence 609(a)(2), which permits impeachment of any witness with past crimes involving dishonesty or falsity, such as passing bad checks and lying to police. Lie once, lie again: If an alien is willing to fudge small details, Congress has said, the IJ may infer he's also willing to fabricate a history of abuse to avoid removal from the United States. "[A] man with a criminal background [may indeed] also face severe persecution in his home country," maj. op. 30 n.15, but a man who is caught telling tales can't rehabilitate himself by telling more tales. After so much dishonesty, Oshodi could have recounted the torture of Gloucester in *King Lear* and it would have done him no good.

The rampant inconsistencies in Oshodi's testimony and his long record of dishonesty and lawlessness amply support the IJ's adverse credibility finding. *See Malkandi* v. *Holder*, 576 F.3d 906, 912 (9th Cir. 2009). That's all we need to know to deny the petition and uphold the agency's decision.

*          *          *

Today's ruling impairs the ability of immigration judges to manage their crushing caseload, and benefits fabulists and

charlatans at the expense of the real victims of persecution. It disregards Supreme Court precedent and takes a giant step towards importing the Constitution into the realm of administrative procedure.  I can't say precisely where my colleagues' ill-conceived constitutional venture will end, but it will be nowhere good.  I'll have none of it.

**Appendix**

The IJ's credibility findings in Oshodi's case:

> The Court finds the testimony of the expert witness, Professor James Mitchell, credible and worthy of significant weight. However, although the respondent provided a very detailed declaration as to his claim, is college educated and mature in years, there were numerous contradictory matters and inconsistent statements, as well as omissions from his claim which undermine his credibility. At the onset, the respondent's acknowledged use of made up false names all cast doubt upon his forthrightness. For instance, the respondent claimed that he informed the court that convicted him of "Vehicular Manslaughter while Intoxicated" of his true name, but yet it is not the name under which he is convicted.

> The respondent's brother was sitting in Court during the entire proceeding, and even though the respondent was represented by counsel, the respondent never called his brother to testify. The respondent surely knew that the entirety of his identity and claimed problems owing to his activities and family were certainly in dispute. Not only did the respondent's brother not testify, he failed to submit an affidavit. At the very least, the respondent's brother could have testified as to the respondent's clan or ethnic tribe, who the

respondent's mother was and her political involvement in Nigeria, who the respondent's father was and whether he is living or deceased, whether other family members had been granted asylum in the United States as the respondent claimed, and any problems that he may be aware of as experienced by the respondent. These inconsistencies concerning the respondent's family undermine the respondent's claim that he is who he says he is.

Other aspects of his testimony undercut his credibility. The respondent complained that he learned a substantial amount of his property was confiscated in Nigeria. Later, the respondent admitted that the properties were not in his name and that the deed was never transferred. The lands are actually part of an estate for his half-siblings.

The respondent also failed to satisfactorily explain whether his father was living or deceased. The testimony of Professor Mitchell seems to indicate that in his conversations with the respondent, that to the best of the Professor's recollection, the respondent indicated that he is estranged from his father, but that the father is living in southern California. Also, the respondent testified that, in a sworn Q&A with immigration authorities, he claimed he feared harm in Nigeria, not because of his mother as he lists as one of the reasons on his

application, but because of his "dad." This is in conflict with the respondent's previous testimony, when he stated that his father had no political involvement. In an attempt to explain the inconsistency, the respondent denied that the sworn statement taken by immigration officials was true, saying that the transcription is not in his handwriting, and the only mention during the Q&A was his "grandad" or grandfather. He further explained, that although he admitted to initialing the statement, he was not given a chance to read it. However, the Q&A transcript had been admitted into evidence without objection. In addition, the respondent's explanation would be undermined, as his asylum application does not cite to his grandfather as a basis for his fear of returning to Nigeria at all.

There were also notable omissions and discrepancies between the respondent's application and his testimony. The respondent's application failed to list all ten siblings, and where they live. The respondent expressed confusion because some of his siblings are half-siblings. However, his claim of confusion is undermined, as three of the respondent's four siblings in the United States are half-siblings, and yet he listed three on his application. The respondent also failed to mention all of his siblings legally in the United States when he was questioned by the Court on February 6, 2006, saying that he had

only two brothers and one sister. Furthermore, the respondent did not list any of the siblings out of the United States on his application and he failed to disclose that one sister still lives in Nigeria. These inconsistencies and discrepancies between his testimony and application further undermine his credibility.

Moreover, when the Court asked the respondent about his father, he claimed that his father had regularly come and gone from Nigeria. This statement goes to the heart of at least one aspect of the respondent's claim, because the respondent indicated that having the family name "Oshodi," is a clear identifier as to what family he is from, as it is a very prominent name, but not common. His application lists his father as having the same last name. If that is true, and he is living and could come and go from Nigeria without problems, that certainly has a bearing on the respondent's claim that he would be identified and detained in Nigeria because of his name. Considering that the respondent's identity is already in question, his overall credibility is undermined by his use of aliases, and his inconsistencies appear as intentional omissions, the Court finds that he should provide evidence that corroborates this testimony.

Decision & Order of the Immigration Judge at 9–11, May 26, 2006.